No. 24-6755

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

LUIS CARDENAS-ORNELAS,

*Plaintiff-Appellee,*

v.

CALVIN JOHNSON,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Nevada
No. 2:21-cv-00030-ART-MDC
Hon. Anne R. Traum

---

## APPELLEE'S ANSWERING BRIEF

---

**RIGHTS BEHIND BARS**
SAMUEL WEISS
1800 M Street NW Front 1 #33821
Washington, D.C. 20033
(202) 455-4399

**UCLA SCHOOL OF LAW
PRISONERS' RIGHTS CLINIC**
AARON LITTMAN *
385 Charles E. Young Drive E
Los Angeles, CA 90095
(310) 825-9562

Counsel for Plaintiff-Appellee
**Luis Cardenas-Ornelas**

* This brief was prepared with the substantial assistance of UCLA School of Law Prisoners' Rights Clinic students Dylan Brenner, Nicholas Castellano, Sara Orton, and Allie Zenwrith.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT ...................................................... 2

ISSUES PRESENTED .......................................................................... 3

STATEMENT OF THE CASE ............................................................. 4

    I.    Warden Johnson deprived Mr. Cardenas-Ornelas of outdoor exercise or any meaningful Alternative for over a year. ..................................... 4

        A.    Warden Johnson Locked Down Mr. Cardenas-Ornelas in His Cell and Deprived Him of Yard Time and Other Forms of Exercise for Over a Year. ......................................................... 4

        B.    Prisoners in Other Units Were Allowed Yard Time but Those in Mr. Cardenas-Ornelas's Unit Were Permitted to Leave Their Cells Only to Perform Manual Labor in an Indoor Warehouse Where Social Distancing Was Impossible. ................................ 5

        C.    Prisoners in Mr. Cardenas-Ornelas's Unit Were Not Allowed Outside Even When the Facility Reported No Active Infections and When Policy Required Individualized Rather Than Group Quarantine. ................................................................................ 6

        D.    Warden Johnson Deprived Mr. Cardenas-Ornelas of Outdoor Exercise or Any Meaningful Alternative Not to Prevent Infection but Because of Staffing Shortages, Preference for Revenue Generation, and Disfavor Towards Those in Protective Custody. ................................................................................. 8

    II.    Procedural History ........................................................... 10

SUMMARY OF THE ARGUMENT .................................................. 13

STANDARD OF REVIEW ................................................................. 15

I.  Warden Johnson Misconstrues Disputed Material Facts in His Favor. ................................................................................ 16

II. This Court May Consider Facts After the Date of the Initial Complaint. ....................................................................... 18

ARGUMENT ............................................................................. 21

I.  This Court Lacks Jurisdiction to Hear This Interlocutory Appeal Because The Coextensive State Constitutional Claims Will Compel Trial. .................................................................................. 21

    A.  Mr. Cardenas-Ornelas Has Brought Valid *Mack* Actions for Damages Against Warden Johnson for Violations of Nevada's Constitution. ........................................................... 23

        1.  Nevada's Cruel or Unusual Punishment and Equal Protection Provisions Are Self-Executing Since They Prohibit Government Conduct........................................ 24

        2.  The Three Steps of the *Mack* Framework Demonstrate That a Damages Remedy is Appropriate....................... 25

        3.  Nevada's *Mack* Framework Does Not Compel the Same Conclusions as California's *Katzberg*. ........................ 30

    B.  Neither Qualified Immunity nor Sovereign Immunity Applies to Mr. Cardenas-Ornelas's *Mack* Actions. .................................. 33

    C.  Because Identical Nevada Claims Will Proceed, This Court Lacks Jurisdiction to Hear an Interlocutory Appeal of the Denial of Qualified Immunity Regarding the Federal Constitutional Claims. ............................................. 34

II. The District Court Correctly Denied Warden Johnson Qualified Immunity on the Eighth Amendment Claim...................................... 40

    A.  The District Court Correctly Held That There Is a Clearly Established Right to Exercise in Prison................................. 40

iii

1.    Controlling Case Law Has Clearly Established a Right to Regular Outdoor Exercise or in Some Circumstances Other Meaningful Recreational Opportunities. ............. 40

2.    Although Emergencies May Justify Short-Term Limits on Exercise Opportunities, It Is Clearly Established That Exercise May Not Be Eliminated for Staffing or Budgetary Reasons. ......................................... 43

B.    The District Court Correctly Held That Mr. Cardenas-Ornelas Offered Evidence Sufficient to Prove That Warden Johnson Violated This Clearly Established Right. ................................ 44

1.    Warden Johnson, Well Aware of the Lengthy Deprivation of Opportunities to Exercise, Was Deliberately Indifferent. .................................. 44

2.    Mr. Cardenas-Ornelas Was Afforded No Meaningful Alternative to Outdoor Exercise. ................................... 47

3.    Even in Theory, the Pandemic Could Not Justify the Lengthy Deprivation of All Access to Exercise. In Fact, Unit 9's Yard Time Was Cancelled for Unlawful Staffing and Budgetary Reasons. .................................. 49

4.    Warden Johnson Was Personally Responsible for Depriving Mr. Cardenas-Ornelas of Exercise. ............. 52

III.    The District Court Correctly Denied Warden Johnson Qualified Immunity on The Equal Protection Claim. ......................................... 54

A.    Prisoners Have a Clearly Established Right Not to Be Subjected to Discrimination Unless Justified by Legitimate Penological Interests. ................................................................. 54

B.    A Jury Could Find That Warden Johnson Lacked Any Penological Justification for Depriving Unit 9 of Outdoor Exercise While Affording It to Others. ................................... 58

CONCLUSION ................................................................. 61

iv

STATEMENT OF RELATED CASES ................................................................... 62

CERTIFICATE OF COMPLIANCE ..................................................................... 64

CERTIFICATE OF SERVICE ................................................................................ 65

# TABLE OF AUTHORITIES

## Cases

*Allen v. Sakai*, 40 F.3d 1001 (9th Cir. 1994) ..................................................... passim

*Alper v. Clark Cnty.*, 571 P.2d 810 (Nev. 1977) ..................................................... 34

*Antonelli v. Sheahan*, 81 F.3d 1422 (7th Cir. 1996) ................................................. 41

*Argonaut Great Cent. Ins. Co. v. Audrain Cnty. Joint Commc'ns*, 781 F.3d 925 (8th Cir. 2015) ................................................................................................. 37

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................... 35

*Ashker v. Cal. Dep't of Corr.*, 350 F.3d 917 (9th Cir. 2003) ................................... 56

*Beard v. Banks*, 548 U.S. 521 (2006) ..................................................................... 55

*Behrens v. Pelletier*, 516 U.S. 299 (1996) .............................................................. 36

*Beier v. City of Lewiston*, 354 F.3d 1058 (9th Cir. 2004) ................................. 36, 37

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) ........................................................................................................ 27

*Bonham v. Nevada*, No. 2:20-cv-1768, 2024 WL 3387361 (D. Nev. July 11, 2024) ..................................................................................................................... 11

*Boyd v. Henry*, No. 2:23-cv-1022, 2024 WL 4046456 (D. Nev. May 9, 2024) ..... 11

*Brooks v. Skinner*, 139 F. Supp. 3d 869 (S.D. Ohio 2015) ..................................... 20

*Bullard v. Blue Hills Bank*, 575 U.S. 496 (2015) ................................................... 38

*Burnham v. Cal. Pub. Empl. Retirement Sys.*, 208 Cal. App. 4th 1576 (2012) ...... 33

*Campbell v. Cauthron*, 623 F.2d 503 (8th Cir. 1980) ....................................... 44, 47

*Campbell v. Kallas*, 936 F.3d 536 (7th Cir. 2019) ................................................. 37

*Cobbledick v. United States*, 309 U.S. 323 (1940) ................................................. 38

*Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010) .......................... 17

*DiMartini v. Ferrin*, 889 F.2d 922 (9th Cir. 1989) ................................................ 36

*Dorwart v. Caraway*, 58 P.3d 128 (Mont. 2002) ................................................... 38

*Dunne v. Smith*, No. 1:07-cv-00074, 2009 WL 840651 (E.D. Cal. Mar. 27, 2009) 56

*Echeverria v. State*, 495 P.3d 471 (Nev. 2021) ....................................................... 33

*El-Khali v. Usen*, No. 21-1140021, 2021 WL 4621828 (6th Cir. Oct. 7, 2021) .... 20

*Espinal-Dominguez v. Puerto Rico*, 352 F.3d 490 (1st Cir. 2003) ........................ 36

*Farmer v. Brennan*, 511 U.S. 825 (1994) .......................................................... 44, 45

*Freeman v. Arpaio*, 125 F. 3d 732 (9th Cir. 1997) ................................................. 54

*Frost v. Symington*, 197 F.3d 348 (9th Cir.1999) .............................................. 56, 58

*Garraway v. Ciufo*, 113 F.4th 1210 (9th Cir. 2024) ............................................... 38

*Gates v. Superior Court*, 32 Cal. App. 4th 481 (1995) .......................................... 33

*Giacalone v. Dubois,* 121 F.3d 695 (1st Cir. 1997) ............................................... 40

*Giraldo v. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231 (2008) .......... 30, 31, 32

*Hayward v. Procunier*, 629 F.2d 599 (9th Cir. 1980). ............................................ 43

*Henrickson v. Nevada*, No. 2:20-cv-01014, 2021 WL 1603965 (D. Nev. Mar. 23, 2021) ....................................................................................................................... 49

*Hubbard v. Port Auth. of N.Y. & N.J.*, No. 05-cv-4396, 2008 WL 464694 (S.D.N.Y. Feb. 20, 2008) .............................................................................. 20

*In re Ozenne*, 841 F.3d 810 (9th Cir. 2016) .......................................................... 34

*Johnson v. Fankell*, 520 U.S. 911 (1997) ............................................................... 35

*Johnson v. Jones*, 515 U.S. 304 (1995) ...................................................... 15, 35, 51

*Johnson v. Myers*, 129 F.4th 1189 (9th Cir. 2025) .................................... 15, 52, 59

*Jund v. Town of Hempstead*, 941 F.2d 1271 (2d Cir. 1991) ................................... 20

*K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962 (9th Cir. 2015) ............................. 39

*Katzberg v. Regents of Univ. of Cal.*, 58 P.3d 339 (Cal. 2002) ....................... 23, 29

*Keenan v. Hall*, 83 F.3d 1083 (9th Cir. 1996) ....................................................... 45

*Laakonen v. Eighth Judicial Dist. Ct.*, 538 P.2d 574 (Nev. 1975) .................. 22, 28

*LeMaire v. Maass*, 12 F.3d 1444 (9th Cir. 1993) ............................................ passim

*Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000) (en banc)......................... 19, 45, 46

*M.H. v. Cnty. of Alameda*, 90 F. Supp. 3d 889 (N.D. Cal. 2013).......................... 32

*Mack v. Williams*, 522 P.3d 434 (Nev. 2022).................................................... passim

*Maney v. Oregon*, No. 6:20-cv-00570, 2024 WL 1695083 (D. Or. Apr. 19, 2024). 7

*Mangiaracina v. Penzone*, 849 F.3d 1191 (9th Cir. 2017)...................................... 7

*Mariscal-Ochoa v. State*, 550 P.3d 813 (Nev. 2024) ............................................ 28

*May v. Baldwin*, 109 F.3d 557 (9th Cir. 1997)...................................................... 40

*McCray v. Lee,* 963 F.3d 110 (2d Cir. 2020) ........................................................ 40

*McLaurin v. Morton*, 48 F.3d 944 (6th Cir. 1995) ................................................ 37

*Mitchell v. Forsyth*, 472 U.S. 511 (1985)....................................................... 2, 13, 35

*Mitchell v. Rice,* 954 F.2d 187 (4th Cir. 1992)...................................................... 40

*Naovarath v. State*, 779 P.2d 944 (Nev. 1989).................................................. 22, 28

*Norbert v. City & Cnty. of San Francisco,* 10 F.4th 918 (9th Cir. 2021).. 41, 42, 47, 48

*Norwood v. Vance,* 591 F.3d 1062 (9th Cir. 2009) ........................................... 43, 49

*Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092 (9th Cir. 2010) ................................................................................................................. 11

*Ortiz v. Jordan*, 562 U.S. 180 (2011) ................................................................... 35

*Patterson v. Mintzes,* 717 F.2d 284 (6th Cir. 1983) ............................................. 41

*Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) ........................................... 52, 53

*Perkins v. Kan. Dept. of Corrs.*, 165 F.3d 803 (10th Cir. 1999) ........................... 41

*Peterkin v. Jeffes,* 855 F.2d 1021 (3d Cir. 1988)................................................... 40

*Pierce v. County of Orange*, 526 F.3d 1190 (9th Cir. 2008)............................. 42, 47

*Prison Legal News v. Lehman*, 272 F. Supp. 2d 1151 (W.D. Wash. 2003) ..... 56, 58

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741 (9th Cir. 2006) ........... 19

*Rico v. Rodriguez*, 120 P.3d 812 (Nev. 2005) ......................................................... 28

*Ross v. Johnson*, No. 2:22-cv-00259, 2023 WL 3864995 (D. Nev. June 6, 2023) . 9, 51, 52

*Seaplane Adventures, LLC v. Cnty. of Marin*, 71 F.4th 724 (9th Cir. 2023) .......... 59

*Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008) ....................................... 54, 55, 57

*Shorter v. Baca*, 895 F.3d 1176 (9th Cir. 2018) .................................. 41, 43, 51, 52

*SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110 (9th Cir. 2022) ......................... 59

*Spain v. Procunier*, 600 F.2d 189 (9th Cir. 1979) ...................................... passim

*Sutton v. Stewart*, 22 F. Supp. 1097 (D. Ariz. 1998) ............................................. 55

*Taylor v. Cnty. of Pima*, 913 F.3d 930 (9th Cir. 2019) ......................................... 39

*Thomas v. Ponder*, 611 F.3d 1144 (9th Cir. 2020) ................................... passim

*Toussaint v. Yockey*, 722 F.2d 1490 (9th Cir. 1984) ....................................... 45, 49

*Turner v. Safley*, 482 U.S. 78 (1987) ..................................................................... 55

*Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000) .............................................. 13

*Wagner v. Prof'l Engineers in Cal. Gov't*, 354 F.3d 1036 (9th Cir. 2004) ........... 21

*Walker v. Gomez*, 370 F.3d 969 (9th Cir. 2004) .................................................... 54

*Watkins v. City of Oakland*, 145 F.3d 1087 (9th Cir. 1998) ...................... 15, 51, 59

*Williams v. Lane*, 851 F.2d 867 (7th Cir. 1988) ................................................... 54

*Wilson v. Seiter*, 501 U.S. 294 (1991) ................................................................... 40

**Statutes**

28 U.S.C. § 1291 ................................................................................................ 2, 35

28 U.S.C. § 1331 ..................................................................................................... 2

ix

28 U.S.C. § 1367 ............................................................................. 2

Cal. Civ. Code § 52.1 ..................................................................... 32

Nev. Rev. Stat. § 209.461 .............................................................. 18

Nev. Rev. Stat. § 41.031 ........................................................... 33, 34

**Other Authorities**

Brief of Former Article III Judges and Law Professors as Amici Curiae in Support of Respondent, Mohawk Industries, Inc. v. Carpenter, 558 U.S. 100 (2009) (No. 08-678), 2009 WL 2040423 ............................................... 38

Bryan Lammon, *Reforming Qualified-Immunity Appeals*, 87 Mo. L. Rev. 1137 (2022) ......................................................................... 39

Ctrs. for Disease Control & Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Mar. 27, 2020) ....................................................... 17, 50

Joanna C. Schwartz, *How Qualified Immunity Fails*, 127 Yale L.J. 2 (2017) ....... 39

Joanna C. Schwartz, *Qualified Immunity's Selection Effects*, 114 Nw. U. L. Rev. 1101 (2020) ............................................................... 38

UCLA Law Behind Bars Data Project, Historical Facility Counts, GitHub ............ 7

**Rules**

Fed. R. Civ. P. 15(d) ................................................................ 19, 21

**Treatises**

Restatement (Second) of Torts § 874A (A.L.I. 1979) ...................... 26, 27

**Regulations**

NDOC AR 740.10 .......................................................................... 10

**Constitutional Provisions**

Nev. Const. art. I § 6 ........................................................................... passim

Nev. Const. art. I, § 18 ................................................................................ 26

Nev. Const. art. IV, § 21 ......................................................................... passim

U.S. Const. amend. VIII ....................................................................... 12, 22

U.S. Const. amend. XIV ....................................................................... 12, 22

**Case Documents and Dockets**

*Ciolino v. Nevada*, No. 2:23-cv-30 (D. Nev. Jan. 4, 2023) .................................... 11

Declaration of Ronald Oliver in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, Henrickson v. Nevada, No. 2:20-cv-1014 (D. Nev. Feb. 17, 2021) ................................................................... 9

*Jackson v. Nev. Dep't of Corr.*, No. 2:23-cv-124 (D. Nev. Jan. 24, 2023) ............ 11

*Johnson v. Williams*, No. 2:20-cv-1835 (D. Nev. Oct. 1, 2020) .......................... 11

*Keller v. Johnson*, No. 3:23-cv-435 (D. Nev. Aug. 31, 2023) .............................. 11

Notice of Appeal, Jones v. Gittere, No. 2:24-cv-171 (D. Nev. May 13, 2025) ...... 11

Notice of Appeal, McGuire v. Nev. Dep't of Corr., No. 3:23-cv-165 (D. Nev. Mar. 5, 2025) ................................................................................................... 11

Notice of Appeal, Paulo v. Williams, No. 2:19-cv-474 (D. Nev. Feb. 23, 2024) .. 11

Notice of Settlement, Ross v. Johnson, No. 2:22-cv-259 (D. Nev. May 16, 2025) 11

Plaintiff's #2 Supplemental to Plaintiff's Motion for Summary Judgment, McGuire v. Nev. Dep't of Corr., No. 3:23-cv-165 (D. Nev. Aug. 7, 2024).... 18, 50, 60

Stipulation to Dismissal with Prejudice, Fowler v. Sisolak, No. 2:19-cv-1418 (D. Nev. Apr. 18, 2022) ................................................................................. 11

Stipulation to Dismissal with Prejudice, Gillen v. Johnson, No. 2:23-cv-1130 (D. Nev. Sep. 11, 2024) ................................................................................. 11

Stipulation to Dismissal with Prejudice, Henrickson v. Nevada, No. 2:20-cv-1014 (D. Nev. Aug. 9, 2021) .................................................................................... 11

Stipulation to Dismissal with Prejudice, Ross v. Sandoval, No. 2:17-cv-2386 (D. Nev. Mar. 16, 2019) ..................................................................................... 11

Stipulation to Dismissal with Prejudice, Thomas v. Johnson, No. 2:22-cv-1918 (D. Nev. Dec. 19, 2023) ..................................................................................... 11

# INTRODUCTION

On March 18, 2020, Warden Johnson ordered a prison-wide lockdown of High Desert State Prison ("HDSP"). 30 days later he sent prisoners in Unit 9 back to work indoors. Otherwise, he left them locked in their cells, without access to outdoor (or indoor) exercise, for nearly 500 days.

Mr. Cardenas-Ornelas was one of the prisoners in Unit 9, a protective custody unit at HDSP. Under the guise of protecting them from COVID, Warden Johnson deprived those in his unit of virtually all access to outdoor exercise for nearly 500 days while simultaneously ordering that they work in a poorly ventilated warehouse, sorting clothes hangers or cards, among 130 other men. Meanwhile, other units at HDSP were provided regular access to outdoor exercise during the same period.

Warden Johnson suggests that Mr. Cardenas-Ornelas's lengthy deprivation was justified by concerns about infection control. But the evidentiary support for this position is shaky at best. Instead, significant record evidence suggests that the pandemic was an excuse; rather, Mr. Cardenas-Ornelas was denied opportunities to exercise due to a combination of staffing shortages, the Warden's preference for revenue generation over constitutional rights, and his disfavor towards prisoners in protective custody. Recognizing this, the district court held that there were triable issues of fact regarding the unconstitutionality of Warden Johnson's actions and denied him qualified immunity.

1

Because Mr. Cardenas-Ornelas brought analogous claims under both the United States and Nevada Constitutions, the latter of which are not subject to a qualified immunity defense, the Court should dismiss this appeal for lack of jurisdiction. Even if it were to hear the appeal, affirmance is required. Warden Johnson's disagreements with the district court's view of the facts are neither compelling nor within the purview of interlocutory review. And his disagreements with the district court's view of the law are unfounded: it has long been clearly established that prison officials violate the Eighth Amendment when they deprive prisoners of outdoor exercise (or a meaningful alternative), and that they violate the Equal Protection Clause when they deny some prisoners but not others yard time without a legitimate penological basis.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331, 1367. While Warden Johnson timely filed his interlocutory appeal, this Court lacks jurisdiction because, as explained in Part I of the Argument, *infra*, *Mitchell v. Forsyth*'s exception to 28 U.S.C. § 1291's final order requirement does not apply. 472 U.S. 511, 530 (1985).

## ISSUES PRESENTED

I.   The final judgment rule generally precludes interlocutory appeals. There are limited exceptions, including some instances when qualified immunity is denied. In addition to his federal constitutional claims, Mr. Cardenas-Ornelas brought analogous claims under Nevada's state constitution for which qualified immunity is categorically unavailable as a defense. Since the coextensive state claims will proceed to trial regardless of whether qualified immunity applies to the federal claims, does this Court lack jurisdiction to hear this appeal?

II.  This Court's decisions, and others, have clearly established that an incarcerated person has a right to outdoor exercise, or otherwise meaningful recreational opportunities, under the Eighth Amendment. Was the district court correct in determining that qualified immunity was not available to Warden Johnson when he denied Mr. Cardenas-Ornelas outdoor exercise and failed to provide any meaningful alternative for well over a year?

III. This Court's decisions, and others, have clearly established that an incarcerated person cannot be arbitrarily denied outdoor exercise time when others are not. Was the district court correct in determining that qualified immunity was not available to Warden Johnson when he denied Mr.

Cardenas-Ornelas—but not those in other units—access to yard time while requiring them to work indoors?

## STATEMENT OF THE CASE

**I.  WARDEN JOHNSON DEPRIVED MR. CARDENAS-ORNELAS OF OUTDOOR EXERCISE OR ANY MEANINGFUL ALTERNATIVE FOR OVER A YEAR.**

### A.  Warden Johnson Locked Down Mr. Cardenas-Ornelas in His Cell and Deprived Him of Yard Time and Other Forms of Exercise for Over a Year.

In March 2020, Mr. Cardenas-Ornelas was housed in Unit 9—a protective custody unit—at High Desert State Prison. (2-ER-73, 77; 3-ER-423.) When the pandemic began, Warden Johnson placed the entire prison on lockdown for over a month, from March 18 to April 27. (2-ER-73; 3-ER-269, 423.) For these forty days, prisoners in the facility were confined to their cells around the clock, except for brief showers every third day. (2-ER-73.) Although Warden Johnson lifted these extreme restrictions for most of the prison in late April, Mr. Cardenas-Ornelas and those on his unit were deprived of access to regular outdoor exercise and other forms of

recreational activity for 496 days.[1] (2-ER-72-73, 147-48, 152; 3-ER-423, 440; 4-ER-467.)

Thus, for over a year, Mr. Cardenas-Ornelas was locked in his cell nearly all day, every day. (*Id.*) He went over a year with essentially no fresh air or sunlight. (*Id.*) Without yard or tier time, he could not exercise. (*Id.*) Predictably, he developed anxiety and suffered bouts of severe depression; he also experienced significant muscle loss, joint pain, and other physical ailments. (4-ER-472, 631.)

### B. Prisoners in Other Units Were Allowed Yard Time but Those in Mr. Cardenas-Ornelas's Unit Were Permitted to Leave Their Cells Only to Perform Manual Labor in an Indoor Warehouse Where Social Distancing Was Impossible.

At the end of April 2020, after over a month of facility-wide lockdown, Warden Johnson allowed most units in the prison to return to the recreation yard. (2-ER-76, 3-ER-424.) But not Unit 9. (2-ER-72; 3-ER-440.) Instead, he sent them back to work. (2-ER-73; 3-ER-423.) Indoors. (2-ER-56, 73; 4-ER-627.)

For months on end, Mr. Cardenas-Ornelas left his cell only to go to an onsite warehouse where social distancing was impossible. (2-ER-72-73; 3-ER-433.) Two

---

[1] In early 2021, Mr. Cardenas-Ornelas began to intermittently receive occasional hours of outdoor exercise. (4-ER-480 (no more than one hour per week for five or six weeks in late January and February; none in March, no more than three hours per week for period beginning in early April).) As of the end of July 2021, Unit 9 returned to normal out-of-cell time, including at least 36 hours weekly for exercise, at least of 5 of which were outdoors. (4-ER-472.)

days per week, he was required to sort clothes hangers or cards for up to eight hours

at a time. (3-ER-293.) He stood at a table within two feet of approximately six other

incarcerated workers, in a space containing about 130 other individuals from at least

four different housing pods. (2-ER-75-76, 100-01; 3-ER-433.) Masks, testing, and

temperature checks were scarce. (2-ER-75; 3-ER-422; 4-ER-433.)

### C. Prisoners in Mr. Cardenas-Ornelas's Unit Were Not Allowed Outside Even When the Facility Reported No Active Infections and When Policy Required Individualized Rather Than Group Quarantine.

Warden Johnson's refusal to allow Unit 9 to exercise on the yard persisted

despite a lengthy period during which not a single incarcerated person at the facility

contracted COVID, and despite an institutional policy of individual rather than group

quarantine.

Record evidence offered by Warden Johnson does not document every

infection occurring at HDSP, much less localize each one at the unit level; instead,

it reflects a handful of infections in May, June, and August 2020, with only the May

and June infections identified as involving exposure by prisoners in Unit 9. (3-ER-

433-37, 443.) It is no surprise that the Warden did not offer evidence of additional

infections warranting quarantine of Unit 9 in the fall of 2020. During this time, the

Nevada Department of Corrections (NDOC) regularly posted facility-level infection

data on its website. It reported not a single new infection in any person incarcerated at HDSP for 91 days beginning on August 11, 2020.[2]

Moreover, NDOC policy dictated individualized rather than group quarantine in response to suspected or confirmed infections as early as May 2020. The written policies in the record nowhere mandate either unit-wide quarantine or preclude outdoor exercise. (3-ER-202-07.) In several public communications, the department instead explained that asymptomatic prisoners should be isolated only if they had been in close contact (within six feet) of an infected person for more than fifteen minutes. (3-ER-225, 243, 245, 254.) By mid-October of that year, HDSP officials

————————————————

[2] These statistics were reported daily on the NDOC's online dashboard, available at https://app.powerbigov.us/view?r=eyJrIjoiNDMwMDI0YmQtNmUyYS00ZmFjL WI0MGItZDM0OTY1Y2Y0YzNhIiwidCI6ImU0YTM0MGU2LWI4OWUtNGU2 OC04ZWFhLTE1NDRkMjcwMzk4MCJ9, which has since been taken down. However, the UCLA Law Behind Bars Data Project was funded by the CDC to collect data on COVID infections produced by all departments of corrections and has preserved it for use by courts, policymakers, and researchers. *See Maney v. Oregon*, No. 6:20-cv-00570, 2024 WL 1695083, at *15 (D. Or. Apr. 19, 2024) (discussing widespread expert reliance on UCLA dataset); *Mangiaracina v. Penzone*, 849 F.3d 1191, 1193 n.1 (9th Cir. 2017) (recognizing propriety of judicial notice of jail regulations). For the dataset itself, see UCLA Law Behind Bars Data Project, Historical Facility Counts, GitHub, https://github.com/uclalawcovid19behindbars/data/blob/db9b5661bc0d9562aec006 bbe9c518f94e3b74cc/historical-data/historical_facility_counts.csv?download= (Feb. 9, 2023); *see also id.*, Data, https://github.com/uclalawcovid19behindbars/data (discussing collection of facility-level time-series data); *id.*, Historical Data, https://github.com/uclalawcovid19behindbars/historical-data (same).

informed staff and prisoners that they would follow this approach. As a Sergeant Barth explained to "staff & inmates": "inmate protocol is that they will go into quarantine if they are displaying signs and unless the unit is showing signs they are the only ones that will be quarantined and the unit will not be locked down." (3-ER-445.)

Yet throughout this time, and well into the following year, Warden Johnson kept Mr. Cardenas-Ornelas locked in his cell when he was not at work in the warehouse. (3-ER-268; 4-ER-631.)

> ### D. Warden Johnson Deprived Mr. Cardenas-Ornelas of Outdoor Exercise or Any Meaningful Alternative Not to Prevent Infection but Because of Staffing Shortages, Preference for Revenue Generation, and Disfavor Towards Those in Protective Custody.

Warden Johnson ran HDSP. (3-ER-421.) While the Department's Medical Director issued some statewide "guidance" about pandemic response, decisions about who to send to the yard were "handled at the local level" by the facility administration. (3-ER-426-27.)

Although Warden Johnson says that his decision to deprive Unit 9 of all out-of-cell time other than that spent working in a warehouse was made "for the protection of inmates and staff alike," there is substantial record evidence to the contrary, including from the mouths of HDSP officials themselves. (3-ER-423.)

8

Warden Johnson and other officials have repeatedly admitted that staffing shortages, a preference for prisoner labor over recreation, and disfavor towards those in protective custody[3] were the true reasons for the denial. (2-ER-56; 3-ER-423, 435.) Even the opening brief acknowledges that the requisite "level of supervision . . . [was] simply not available in the yard."[4] OB at 37.[5] In a striking concession, the associate warden of HDSP at the time explained that officers were "posted to Prison Industries" rather than to yard supervision because officers overseeing prisoners' work were "paid with funds outside those allocated to HDSP." (2-ER-56.) Correctional officers understood what was going on, telling prisoners that they were being made to sort detritus in a cramped warehouse instead of being allowed outdoor exercise because Warden Johnson and HDSP chose to prioritize revenue— "contract" over "constitution[.]" (2-ER-73, 108, 110, 113.) Supervising the warehouse paid; supervising the yard cost money.

---

[3] Numerous staff members informed Mr. Cardenas-Ornelas that Unit 9 was singled out for deprivation of outdoor exercise because Warden Johnson disliked those in protective custody. (2-ER-77.)

[4] They made similar admissions in other litigation. *See* Declaration of Ronald Oliver in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction at 2, Henrickson v. Nevada, No. 2:20-cv-1014 (D. Nev. Feb. 17, 2021) (denial of outdoor exercise was due to staffing shortages); *Ross v. Johnson*, No. 2:22-cv-00259, 2023 WL 3864995, at *2 (D. Nev. June 6, 2023) (testimony of another warden at HDSP that pandemic exacerbated understaffing).

[5] All citations to the opening brief are to CM/ECF pagination.

A COVID outbreak did occur in Unit 9 at the end of December 2020. (2-ER-110, 117.) Prison officials' response to it further undercuts the suggestion that Warden Johnson's decisions were motivated by concern for prisoners' health. Per the declarations of three individuals incarcerated alongside Mr. Cardenas-Ornelas, those in Unit 9—including some known or suspected to be infected—were nevertheless instructed to report to work. (2-ER-107-08, 110, 113.) While they were being escorted to the warehouse, a supervising officer told them, "I think you all should be on quarantine. 48 of you between D and F [pods] have tested positive. I do not know why they are letting you go to work. As long as you hit your numbers, I don't give a fxxk. Let's go." (2-ER-113.)

## II.    PROCEDURAL HISTORY

Mr. Cardenas-Ornelas grieved the denial of outdoor exercise. (3-ER-280.) On August 20, 2020, Warden Johnson denied his step one grievance. (3-ER-275.) On November 2, 2020, Mr. Cardenas-Ornelas exhausted the grievance process when his step two grievance was denied. (2-ER-42 (citing NDOC AR 740.10); 3-ER-270, 312.) Mr. Cardenas-Ornelas filed suit, and his lawsuit was docketed on January 7, 2021. (4-ER-504.) He is not the only one to sue: within the last eight years, others

10

have sued High Desert State Prison officials at least fifteen times for violating their

Eighth Amendment rights by depriving them of outdoor exercise.[6]

_____

[6] Given that this litigation raises closely related factual issues, Mr. Cardenas-Ornelas cites representations made by Warden Johnson and other officials in some of these cases and asks that the Court take judicial notice of them. *See Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1112 n.14 (9th Cir. 2010) (taking judicial notice of defendant's "briefs in other courts").

Six of them have settled. *See* Notice of Settlement, Ross v. Johnson, No. 2:22-cv-259 (D. Nev. May 16, 2025) (parties settled after court granted two preliminary injunctions); Stipulation to Dismissal with Prejudice, Henrickson v. Nevada*,* No. 2:20-cv-1014 (D. Nev. Aug. 9, 2021) (parties settled after court granted preliminary injunction); *see also* Stipulation to Dismissal with Prejudice, Gillen v. Johnson, No. 2:23-cv-1130 (D. Nev. Sep. 11, 2024); Stipulation to Dismissal with Prejudice, Thomas v. Johnson, No. 2:22-cv-1918 (D. Nev. Dec. 19, 2023); Stipulation to Dismissal with Prejudice, Fowler v. Sisolak, No. 2:19-cv-1418 (D. Nev. Apr. 18, 2022); Stipulation to Dismissal with Prejudice, Ross v. Sandoval, No. 2:17-cv-2386 (D. Nev. Mar. 26, 2019).

Three are currently pending on appeal, as discussed in the statement of related cases below. *See* Notice of Appeal, Jones v. Gittere, No. 2:24-cv-171 (D. Nev. May 13, 2025); Notice of Appeal, McGuire v. Nev. Dep't of Corr., No. 3:23-cv-165 (D. Nev. Mar. 5, 2025); Notice of Appeal, Paulo v. Williams, No. 2:19-cv-474 (D. Nev. Feb. 23, 2024).

Four remain pending in district court as of May 28, 2025. *See Keller v. Johnson*, No. 3:23-cv-435 (D. Nev. Aug. 31, 2023); *Jackson v. Nev. Dep't of Corr.*, No. 2:23-cv-124 (D. Nev. Jan. 24, 2023); *Ciolino v. Nevada*, No. 2:23-cv-30 (D. Nev. Jan. 4, 2023); *Johnson v. Williams*, No. 2:20-cv-1835 (D. Nev. Oct. 1, 2020).

And two have been dismissed. *See Bonham v. Nevada*, No. 2:20-cv-01768, 2024 WL 3387361, at *2 (D. Nev. July 11, 2024) (dismissed because third amended complaint failed to state claim); *Boyd v. Henry*, No. 2:23-cv-1022, 2024 WL 4046456, at *4 (D. Nev. May 9, 2024) (dismissed for failure to show personal participation by defendants—not including Warden Johnson—and length of deprivation).

11

In his suit, Mr. Cardenas-Ornelas brought claims against Warden Johnson in his individual capacity for denying him outdoor exercise in violation of the United States and Nevada Constitutions' Cruel and Unusual Punishment and Equal Protection Clauses.[7] (2-ER-72-78.) U.S. Const. amends. VIII, XIV; Nev. Const. art. I, § 6, art. IV, § 21. Initially, Mr. Cardenas-Ornelas moved for a temporary restraining order and preliminary injunction. (4-ER-626-34.) Months later, once Warden Johnson began providing Mr. Cardenas-Ornelas with constitutionally adequate outdoor exercise, these requests became moot. (4-ER-472-73, 477-78.)

When defendants moved for summary judgment, the court granted it to the other defendants, on the basis of lack of personal participation, but denied it to Warden Johnson. (1-ER-20-22, 35.) First, the court held that causes of action existed for Mr. Cardenas-Ornelas's claims under the Nevada constitution. (1-ER-9-13.)

As to the cruel and unusual punishment claims, the district court held that a rational finder of fact could conclude that Warden Johnson unconstitutionally deprived Mr. Cardenas-Ornelas of his right to outdoor exercise. (1-ER-16, 19.) And it held that this right was clearly established. (1-ER-23 (citing *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979); *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir.

---

[7] He also pursued additional claims, which were dismissed during screening and at summary judgment.

1993); *Allen v. Sakai*, 40 F.3d 1001 (9th Cir. 1994)).) Thus, it denied Warden Johnson qualified immunity on the Eighth Amendment claim. (*Id.*)

As to Mr. Cardenas-Ornelas's equal protection claims, the district court held that a rational finder of fact could conclude that Warden Johnson intentionally discriminated against Mr. Cardenas-Ornelas and others in protective custody. (1-ER-28-29.) In addition, it held that a rational finder of fact could conclude that Warden Johnson's justification for the differential treatment was a pretextual excuse and "lacked rational basis." (1-ER-28.) It held that "it is clearly established that a prisoner can assert a class-of-one equal protection claim." (1-ER-30 (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).) Thus, it denied Warden Johnson qualified immunity on the equal protection claim. (*Id.*)

Warden Johnson timely appealed. (4-ER-635.)

## SUMMARY OF THE ARGUMENT

I.   This Court lacks jurisdiction to consider this interlocutory appeal. *Mitchell v. Forsyth* created an exception to the general rule barring interlocutory appeals for some denials of qualified immunity where appellate review will save a defendant from the "costs of trial." 472 U.S. 511, 526-27 (1985). However, since Warden Johnson is not entitled to qualified immunity for Mr. Cardenas-

Ornelas's claims under the Nevada constitution, and those claims are coextensive with the federal claims, this Court lacks interlocutory jurisdiction.

II.  The district court properly denied qualified immunity to Warden Johnson on Mr. Cardenas-Ornelas's federal Eighth Amendment claims. The Ninth Circuit has clearly established that the Constitution requires prison officials to provide regular outdoor exercise—or, in some circumstances, other meaningful recreation opportunities. *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993); *Thomas v. Ponder*, 611 F.3d 1144, 1151-52 (9th Cir. 2020).

III.  The district court properly denied qualified immunity to Warden Johnson on Mr. Cardenas-Ornelas's federal equal protection claims. The Ninth Circuit has clearly established that prisoners cannot be subjected to discrimination not justified by legitimate penological interests. There was no penological justification for denying Mr. Cardenas-Ornelas and Unit 9 access to outdoor exercise while other units were allowed yard time. Further, the alleged infection-control purpose of this treatment was pretextual; Mr. Cardenas-Ornelas and Unit 9 were required to perform labor indoors during the same period.

14

## STANDARD OF REVIEW

A district court's denial of summary judgment based on qualified immunity is reviewed de novo and limited to issues of law. *Johnson v. Myers*, 129 F.4th 1189, 1192-93 (9th Cir. 2025). Indeed, defendants invoking qualified immunity "may not appeal a district court's summary judgment order insofar as that order determines whether the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995). This Court must "take, as given, the facts that the district court assumed when it denied summary judgment." *Watkins v. City of Oakland*, 145 F.3d 1087, 1091 (9th Cir. 1998) (citation omitted). To the extent that it is unclear which facts the district court relied on, this Court must adopt the non-moving plaintiff's version of facts. *Myers*, 129 F.4th at 1193.

Warden Johnson's opening brief gets two of these preliminary matters wrong. He misconstrues disputed facts in his favor, and he argues—incorrectly—that this Court cannot consider facts that occurred after the filing of the complaint.

## I.   WARDEN JOHNSON MISCONSTRUES DISPUTED MATERIAL FACTS IN HIS FAVOR.

First, contrary to OB at 35,[8] there is scant record evidence to support the contention that COVID mitigation policies required extended deprivation of outdoor exercise. As discussed above, Warden Johnson has pointed to no written policy suggesting unit-wide quarantines; indeed, the record reflects that this was expressly contrary to policy as of October 2020. (3-ER-445.) Moreover, for a three-month period in Fall 2020, HDSP reported not a single new infection among incarcerated people.[9]

Second, contrary to OB at 35, there is substantial dispute as to whether protecting prisoners from COVID was the reason Warden Johnson deprived Mr. Cardenas-Ornelas and others in Unit 9 of outdoor exercise; indeed, there is strong evidence that it was not. As discussed above, Warden Johnson himself and other HDSP officials have acknowledged that his decision was motivated by a desire to allocate limited staff to supervision of revenue-generating activity rather than recreation, and there is also record evidence that it was motivated by the Warden's

---

[8] Warden Johnson relies solely on 3-ER-424, a self-authored declaration, stating that on a single day—June 23, 2020—Unit 9 was in quarantine because an unspecified number of people in it had at some point tested positive.

[9] *See supra* note 2.

dislike of prisoners in protective custody. OB at 37-38. (2-ER-56, 73, 77, 108, 110, 113; 3-ER-423.)

Third, contrary to OB at 38, 41-44, 46,[10] the NDOC Medical Director did not suggest—much less order—that people should be denied outdoor exercise. This is not surprising, given that doing so would have been contrary to the public health consensus encouraging outdoor activity.[11]

Fourth, contrary to OB at 37,[12] it was readily possible for people in different units, and even for people in different pods within the same unit, to exercise

---

[10] Warden Johnson relies on two citations to the record. The first is to his own declaration, wherein he states without further support that he was simply following the orders of the NDOC Medical Director. (3-ER-424.) The second is to dozens of pages reflecting the guidance of that medical director. (3-ER-209-56.) However, these pages give him no credence. They show that the NDOC Medical Director addressed a range of concerns: best practices away from work; identification of viral symptoms; when and for how long employees should stay home; social distancing practices; modified procedures for admissions and transfers; masking; processes for reporting when employees tested positive; and placement of those with confirmed or suspected cases in negative air flow cells. (3-ER-209, 212-13, 218, 221, 231-32, 239, 241-50.) But crucially, these records lack any substantiation for the Warden's contention that the NDOC Medical Director suggested people be denied outdoor exercise.

[11] *See* Ctrs. for Disease Control & Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities at 11 (Mar. 27, 2020), https://www.bop.gov/foia/docs/CDCCorrectionalfacilityguidance3.23.pdf; *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010) (taking judicial notice of information displayed publicly on government websites).

[12] Warden Johnson relies solely on 2-ER-56, a declaration by his successor, stating that separating yard time by unit was not possible due to staffing shortages.

separately in the yard. HDSP's yard schedule proves as much. (4-ER-495-501, 628 (verified motion stating same).) *See also* Plaintiff's #2 Supplemental to Plaintiff's Motion for Summary Judgment at 43-50, McGuire v. Nevada Dep't of Corr., No. 3:23-cv-165 (D. Nev. Aug. 7, 2024) (exhibit produced by HDSP officials showing that yard time was separated by units *before* pandemic lockdown).

Fifth, contrary to OB at 33, sorting clothes hangers or cards in a warehouse was no privilege. (2-ER-107.) Nevada statute plainly mandates that prison officials "require" incarcerated people to work. Nev. Rev. Stat. § 209.461.1. Mr. Cardenas-Ornelas faced unfavorable reclassification and other penalties if he refused to work. (2-ER-107.)

## II.    THIS COURT MAY CONSIDER FACTS AFTER THE DATE OF THE INITIAL COMPLAINT.

Additionally, Warden Johnson argues that this Court and the district court must only consider Mr. Cardenas-Ornelas's deprivation of outdoor exercise prior to the submission of his complaint on December 30, 2020, and cannot consider the

---

Verging upon farce, this declaration implies that the warehouse where Mr. Cardenas-Ornelas worked was *safer* than the outdoor yard, *because* it was an enclosed space and could therefore be "fogged" with disinfectant between shifts. *Id.*

continuation of that deprivation up to July 27, 2021, as described in his motions for preliminary injunction and temporary restraining order.[13] OB at 26-30.

First, Warden Johnson asserts that this Court's decision in *Reyn's Pasta Bella* stands for the proposition that Mr. Cardenas-Ornelas's potential damages are limited to those stemming from events prior to this complaint. OB at 26 (citing *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 749 (9th Cir. 2006)). But as the district court correctly recognized, *Reyn*'s holding was limited to "private antitrust actions." (1-ER-14.) On appeal, Warden Johnson attempts to argue that the *Reyn's* rule also applies to § 1983 cases. OB at 27-28. However, the cases he cites merely stand for the proposition that Federal Rule of Civil Procedure 15(d) applies to § 1983 claims (it certainly does), and not for the contention that *Reyn*'s holding applies to such cases.

Next, Warden Johnson formalistically asserts that since Mr. Cardenas-Ornelas did not file a supplemental pleading under Federal Rule of Civil Procedure 15(d), the scope of the suit is limited only to events that occurred prior to the date of his complaint. He relies on non-binding, unpublished Sixth Circuit authority for the

---

[13] Furthermore, it is unclear why Warden Johnson is so attached to this argument, since caselaw makes clear that even much shorter deprivations of exercise than that which had occurred by the time the complaint was filed are actionable. *See Allen*, 40 F.3d at 1003-04 (six weeks); *Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th Cir. 2000) (en banc) (six and a half weeks).

proposition that the "filing of an action fixes the controversy, and after-occurring events cannot be litigated except by the filing of a supplemental pleading with the court's consent." *El-Khali v. Usen*, No. 21-1140021, 2021 WL 4621828, at *4 (6th Cir. Oct. 7, 2021) (citation omitted).

But even courts in the Sixth Circuit do not understand circuit caselaw to impose such a rigid conception of federal notice pleading. For example, in *Brooks v. Skinner*, the court found that when a plaintiff's complaint described the existence of a racially hostile environment, it could consider post-complaint incidents of harassment when those facts "[arose] out of the scheme that was the focus of the pleadings, . . . [were] directly related to the earlier violation, and [would not result in] undue prejudice to the defendants." 139 F. Supp. 3d 869, 884-85 (S.D. Ohio 2015) (quoting *Jund v. Town of Hempstead*, 941 F.2d 1271, 1287 (2d Cir. 1991)). The court reasoned that "[d]efendants are not prejudiced when a complaint puts them on notice that plaintiffs are alleging a continuing action based [for example] on a hostile environment." *Id.* (citing *Hubbard v. Port Auth. of N.Y. & N.J.*, No. 05-cv-4396, 2008 WL 464694, at *7 (S.D.N.Y. Feb. 20, 2008)).

Similarly, Mr. Cardenas-Ornelas's complaint alleges a continuing action—ongoing denial of yard time. (2-ER-76 ("Since March 18, 2020 . . .").) Further, the parties have litigated the post-complaint continuation of the denial in two motions for preliminary injunctive relief. (4-ER-472, 479, 486, 643, 626.) The court

20

eventually denied these requests after prison officials ceased the deprivation at issue, thus mooting the issue. (4-ER-471.) As a result, NDOC has been given more than adequate notice of these facts, which arose out of events alleged in the pleadings and which the parties have already litigated.

Warden Johnson attempts to rely on *Wagner* to support the assertion that Mr. Cardenas-Ornelas was required to obtain leave for a supplemental pleading before the court could consider post-complaint events. *Wagner v. Prof'l Engineers in Cal. Gov't*, 354 F.3d 1036, 1052 (9th Cir. 2004). But in *Wagner*, a case involving a deficient notice to labor union workers, this Court held that a Rule 15(d) supplemental pleading was required only because the plaintiffs were attempting to challenge an entirely new, distinct notice, posted three months after the original complaint was filed. *Id.* at 1051. Because the treatment that continued following the filing of Mr. Cardenas-Ornelas's complaint was not a separate occurrence, a Rule 15(d) motion was unnecessary.

## ARGUMENT

### I. THIS COURT LACKS JURISDICTION TO HEAR THIS INTERLOCUTORY APPEAL BECAUSE THE COEXTENSIVE STATE CONSTITUTIONAL CLAIMS WILL COMPEL TRIAL.

This Court lacks jurisdiction to hear this interlocutory appeal. Mr. Cardenas-Ornelas's outdoor exercise claims are based on violations of his "[E]ighth

Amendment right against cruel and unusual punishment [and] [F]ourteenth Amendment right to equal protection, along with applicable Nevada constitutional rights." (2-ER-72.) U.S. Const. amend. VIII, XIV; Nev. Const. art. I, § 6 (cruel or unusual punishment), art. IV, § 21 (equal protection). Nevada's state equivalents are analyzed using the same standards as their federal counterparts. *See Naovarath v. State*, 779 P.2d 944 (Nev. 1989) (analyzing federal and state Cruel and Unusual Punishment Clauses using same standard); *see Laakonen v. Eighth Judicial Dist. Ct.*, 538 P.2d 574 (Nev. 1975) (analyzing federal and state Equal Protection Clauses using same standard).

The district court correctly recognized that Mr. Cardenas-Ornelas has valid state constitutional claims under *Mack v. Williams*, 522 P.3d 434 (Nev. 2022). (1-ER-11-13.) *See* subpart I.A, *infra*. No qualified immunity applies to *Mack* actions. *See* subpart I.B, *infra*. The denial of qualified immunity under federal law would normally confer interlocutory jurisdiction to this Court. But since the state claims are at least as protective as the federal claims, the exception to the final judgment rule which normally allows interlocutory appeals for denial of qualified immunity does not apply. *See* subpart I.C, *infra*. Accordingly, this Court should dismiss the appeal for want of jurisdiction.

**A.    Mr. Cardenas-Ornelas Has Brought Valid *Mack* Actions for Damages Against Warden Johnson for Violations of Nevada's Constitution.**

The district court correctly held that Mr. Cardenas-Ornelas brought valid state constitutional claims against Warden Johnson. (1-ER-9-13.) In a landmark 2022 decision, *Mack v. Williams*, the Nevada Supreme Court recognized that plaintiffs have a self-executing cause of action for "limiting" provisions under the Nevada constitution, such as its Fourth Amendment analogue. 522 P.3d at 441-42.

The *Mack* court then established a three-step framework for determining whether damages are an available remedy for such self-executing causes of action. *Id.* at 444-45. The *Mack* court expressly declined to follow the federal Supreme Court's *Bivens* jurisprudence, which analyzes such questions in two steps. *Id.* at 444 ("[W]e remain 'free to interpret [our] own constitutional provisions' as we see fit, regardless of any similarities between our state and federal constitutions." (citation omitted)). Instead, the court adopted a three-step framework which originated in California.[14] *Id.* at 443 (citing *Katzberg v. Regents of Univ. of Cal.*, 58 P.3d 339, 347-48 (Cal. 2002)). Those three steps consider (1) the language of the provision,

---

[14] Although *Mack* stated that Nevada would "formally adopt the *Katzberg* framework," its application of that framework expressly differs in several material ways which are discussed at length in subpart I.A.3, *infra*. *Mack*, 522 P.3d at 445.

(2) the Restatement's constitutional tort analysis, and (3) whether special factors counsel limitation. *Id.* 443-45.

### 1. Nevada's Cruel or Unusual Punishment and Equal Protection Provisions Are Self-Executing Since They Prohibit Government Conduct.

The district court correctly determined that self-executing causes of action are created by article I, section 6 and article IV, section 21 of the Nevada constitution. (1-ER-9-13.) A constitutional provision is self-executing, meaning that it does not require legislation to create a cause of action, when it creates a limitation on government action. *Mack*, 522 P.3d at 442. In other words, a provision creates a limitation when it "'prohibit[s] certain conduct' by the government, as opposed to 'indicat[ing] a general principle or line of policy.'" *Id.* (citation omitted).

*Mack* reasoned that when a constitutional provision is prohibitory in nature, "a private cause of action to enforce its proscription" exists, "regardless of any affirmative legislative authorization." *Id.* at 442 (citation omitted). The court then applied this principle to determine that article I, section 18 of the state constitution—its Fourth Amendment analogue—was a limitation on the government's power to act and was thus prohibitory. *Id.* As a result, a self-executing cause of action existed. *Id.*

The district court correctly found that *Mack*'s reasoning applied just as squarely to the Nevada constitution's Eighth Amendment and Equal Protection

Clause analogues. (1-ER-13.) First, article I, section 6 and article IV, section 21 prohibits Nevada from imposing "cruel or unusual punishment." Because this limits the state of Nevada from taking certain actions, there is a private cause of action for this provision. Second, article IV, section 21 states that "all laws shall be general and of uniform operation throughout the State." This prohibits Nevada from applying the law in an unequal manner and thus is also self-executing.

As a result, the lower court correctly determined that there are self-executing causes of action under both the cruel or unusual punishment and equal protection provisions of the Nevada constitution. (1-ER-35.)

## 2. The Three Steps of the *Mack* Framework Demonstrate That a Damages Remedy is Appropriate.

The district court also correctly determined that a damages remedy was available for these state constitutional violations by applying the three-part *Mack* framework. (1-ER-10-12.)

Step 1: The court must determine whether the text of a constitutional provision authorizes or excludes a damages remedy. *Mack*, 522 P.3d at 441. In *Mack*, the Nevada Supreme Court applied step one to determine that article I, section 18 of the Nevada constitution did not authorize or exclude a damages remedy. *Id.* at 445-46. The court reasoned that a provision which

> guarantees "[t]he right of the people to be secure in their persons,
> houses, papers and effects against unreasonable seizures and searches"

> . . . unambiguously does not explicitly authorize a right of action for money damages; however, it unambiguously does not explicitly preclude a right of action for money damages, either.

*Id.* at 445 (quoting Nev. Const. art. I, § 18). Similarly, nothing in the language of the constitution "as a whole" required the legislature to authorize suits against state actors for violations of "the protections therein." *Id.* at 446. Further, the *Mack* court expressly declined to examine any legislative history; because this was a constitutional provision, such history would not be a "determinative factor." *Id.* As a result, the court determined that step one was inconclusive. *Id.*

Here, the text of article I, section 6 is similarly inconclusive. The constitutional provision states: "Excessive bail shall not be required, nor excessive fines imposed, nor shall cruel or unusual punishments be inflicted, nor shall witnesses be unreasonably detained." Nev. Const. art. I, § 6. Nothing in this text favors or disfavors damages. The same is true for article IV, section 21, which states: "In all cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the State." Step one is inconclusive as to both provisions.

Step 2: A court must determine "if [a damages remedy] is in furtherance of the purpose of the [provision]" and "is needed to assure the effectiveness of the provision" based on six factors. *Mack*, 522 P.3d at 445 (quoting Restatement (Second) of Torts § 874A (A.L.I. 1979)). The six factors include: (1) the nature of

26

the legislative provision; (2) the adequacy of existing remedies; (3) the extent to which a tort action supplements or interferes with existing remedies and enforcement; (4) the significance of the purpose of the provision; (5) the extent of the change in tort law; and (6) the burden on the judiciary. *Id.* at 447-48 (citing Restatement (Second) of Torts § 874A).

In *Mack*, the court analyzed these six factors to find that a damages remedy was necessary to further Nevada's search and seizure provision. *Id.* at 447. The court found that the nature and significance of the provision (factors one and four), weighed in favor of a damages remedy since, a constitutional provision demanded that the court "exercise its authority and responsibility to enforce the limitations that the Nevada constitution imposes on the State and its actors for such fundamental, rights." *Id.* at 449. Further, the court found that there was no additional burden on state actors or interference with existing enforcement (factors three and five), since the "conduct proscribed and regulated by the search-and-seizure provision" was "well developed and well settled." *Id.*

Additionally, in discussing the existence of alternative remedies (factor two), the court expressly rejected the existence of either injunctive or declaratory relief as sufficient to undermine the availability of damages, as such relief "rarely, if ever, suffices to remedy a past wrong." *Id.* at 448 (citing *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 409-10 (1971) (Harlan, J.,

concurring)). Further, the court denied that tort law would be sufficient to remedy existing harm since constitutional law, unlike tort law, requires a state actor to not only "respect the rights of other citizens" but to "*protect and defend* those rights." *Id.* (citation omitted, emphasis in original). Finally, the court found that whatever additional burden on the judiciary might exist (factor six) was outweighed by the need of recognizing a damages action to enforce a fundamental right where "no civil remedy is otherwise available." *Id.*

Warden Johnson addresses *Mack* in a footnote. OB at 49 n.4. In that footnote, he has not advanced any arguments about whether these six factors were properly applied. Nor could they—there is no difference between the search and seizure provision analyzed in *Mack* on the one hand, and the cruel or unusual punishment and equal protection clause provisions at issue here on the other. All are constitutional provisions which implicate fundamental rights (factors one and four). Because well-developed caselaw articulates what conduct is prohibited by the analogous provisions of the Nevada and U.S. Constitutions, a damages remedy will likewise impose little additional burden on state actors or interference with existing remedies (factors three and five). *See Naovarath*, 779 P.2d at 944; *Laakonen*, 538 P.2d at 506; *Mariscal-Ochoa v. State*, 550 P.3d 813, 823 (Nev. 2024); *Rico v. Rodriguez*, 120 P.3d 812, 817 (Nev. 2005). Further, just as in *Mack*, injunctive and declaratory relief and tort law are insufficient as alternative remedies. 522 P.3d at

449 (discussing factor two). Finally, just as in *Mack*, any additional burden on the judiciary is far outweighed by the fundamental right at issue. *Id.* (discussing factor six).

Step 3: After finding that step two of *Mack* favors a damages remedy, the district court also correctly found that no special factors counseled hesitation. (1-ER-12.) These special factors include "deference to legislative judgment, avoidance of adverse policy consequences, considerations of government fiscal policy, practical issues of proof, and the competence of courts to assess particular types of damages." *Mack*, 522 P.3d at 449 (quoting *Katzberg*, 58 P.3d at 350)).

*Mack* found that no legislative judgments existed that required deference. *Id.* at 449. There were also no adverse policy consequences since imposing new damages would not result in new limitations on government conduct, and the lack of damages itself would render "the guarantees of the Nevada Constitution" illusory. *Id.* Third, there were no implications for legislative fiscal policy since the Nevada legislature had broadly waived sovereign immunity, consenting to damages liability, and indemnified employees for certain judgments. *Id.* at 449-50. Fourth and fifth, a damages action for retrospective harm created no additional issues of proof since damages are the traditional and preferred remedy for past wrongs. *Id.* at 450.

Here, too, the analysis is identical to that in *Mack*. No legislative judgments, no new fiscal implications, and no additional issues of proof counsel against this

29

traditional and preferred remedy. As a result, a damages remedy is plainly available for violations of the two Nevada constitutional provisions on which Mr. Cardenas-Ornelas has staked his state-law claims.

### 3. Nevada's *Mack* Framework Does Not Compel the Same Conclusions as California's *Katzberg*.

In a footnote, Warden Johnson asserts that because the Nevada Supreme Court adopted California's *Katzberg* framework to determine when a damages remedy is appropriate, it would be required to reach the same conclusions that California courts have reached about their own state cruel or unusual punishment and equal protection clauses. OB at 49 n.4. This argument fails for two reasons. First, although Nevada did adopt a three-step framework akin to California's (rather than adopting a two-step, *Bivens*-like framework), it expressly departed from critical aspects of the California Supreme Court's analysis in *Katzberg* and its progeny. Second, Nevada's statutory law differs from California's in important ways that suggest a different result might obtain even under a similar test.

Comparison of the California Court of Appeals' application of the *Katzberg* framework in *Giraldo* with the analysis in *Mack* is instructive. *Giraldo v. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231 (2008), *review denied*, 2009 Cal. LEXIS 1757 (Cal. Feb. 11, 2009); *Mack*, 522 P.3d at 434. In *Giraldo*, the California Court of Appeals applied *Katzberg*, determining that there was no damages remedy for a

violation of California's cruel or unusual punishment clause. 168 Cal. App. 4th at 256-57. In step one, the *Giraldo* court examined both the text and drafting history of the constitutional provision, determining that affirmative intent to create a damages remedy was absent. *Id.* at 255. In contrast, the Nevada Supreme Court declined to examine any of the constitutional drafting history of the provision during step one, and it found that the lack of any indication in the text meant that the results of further steps would dictate the outcome. *Mack*, 522 P.3d at 445-47.

Next, in step two of *Giraldo*, the California court found state-law negligence torts and § 1983 claims under the federal Constitution's equivalent provision to be adequate alternative remedies. 168 Cal. App. 4th at 255-56. Neither was deemed adequate in *Mack*. The Nevada high court expressly disagreed with the California courts' analysis, rejecting the assertion that state tort law provides meaningful redress for "invasions of the constitutional right at issue here." *Mack*, 522 P.3d at 448. The Nevada Supreme Court went so far as to cite *Katzberg* and the state of California, critically, as an example of a jurisdiction that Nevada was *declining* to follow. *Id.* As for § 1983, the court in *Mack* was surely aware of its availability to vindicate rights arising under the federal Constitution's Fourth Amendment, but it

31

omitted any consideration of this remedy.[15] Although Nevada adopted a three-step framework that asked the same questions as California's, the *Mack* court's application of that framework did not align in important respects with *Katzberg*'s.

Moreover, the statutory landscape in California differs from Nevada's in a significant way: California has its own statutory version of § 1983, the Tom Bane Civil Rights Act, which creates a state-law cause of action for constitutional violations. Cal. Civ. Code § 52.1. Nevada does not have an equivalent. As a result, although California's constitutional prohibition of cruel or unusual punishment does not itself create a private right of action, courts in this circuit have recognized that it can serve as the basis for a valid Bane Act claim. *See M.H. v. Cnty. of Alameda*, 90 F. Supp. 3d 889, 896-97 (N.D. Cal. 2013). This alternative remedy alone might be a sufficient reason to reject a damages remedy in California while recognizing one for an equivalent state constitutional provision in Nevada.

In short, California's *Katzberg* is not Nevada's *Mack*. The three-step framework adopted in *Mack* might have originated in California, but Nevada's *Mack* analysis is its own.[16]

---

[15] The *Giraldo* court did not reach step three of the *Katzberg* test. 168 Cal. App. 4th at 256-57.

[16] Moreover, and contrary to Warden Johnson's suggestion, it is not at all clear that California courts have concluded that its equal protection analogue does not support damages remedies under *Katzberg*. He cites *Burnham v. California Public*

**B. Neither Qualified Immunity nor Sovereign Immunity Applies to Mr. Cardenas-Ornelas's *Mack* Actions.**

Unlike for claims under the federal Constitution, the Nevada Supreme Court concluded in *Mack* that qualified immunity "is not a defense available to state actors sued for violations of the individual rights enumerated in Nevada's Constitution." 522 P.3d at 451.

Confronted with this clear holding, Warden Johnson instead contends that Eleventh Amendment sovereign immunity applies to Mr. Cardenas-Ornelas's state constitutional claims. OB at 47. He states (accurately) that Nevada has created certain procedural requirements when bringing claims under the Government Liability Act ("GLA").[17] Nev. Rev. Stat. §§ 41.031 et seq. He also states (accurately) that Nevada has not waived sovereign immunity from suit under these statutory provisions in federal court. Nev. Rev. Stat. § 41.031(3). As a result, he asserts that

---

*Employees' Retirement System*, 208 Cal. App. 4th 1576, 1588 (2012). But *Burnham* does not apply *Katzberg*; it merely quotes *Katzberg's* discussion of a prior case called *Gates v. Superior Court*. 208 Cal. App. 4th at 1588. The court in *Gates* did determine that there was no damages action under California's equal protection provision, but under a very different test based primarily on an assessment of voter intentions. *Gates v. Superior Court*, 32 Cal. App. 4th 481, 518-19, 523-25 (1995). In other words, neither *Burnham* nor *Gates* supports the proposition that a California court called to apply *Katzberg* to the state's equal protection provision would necessarily conclude that no damages remedy exists.

[17] *See Echeverria v. State*, 495 P.3d 471, 477 n.8 (Nev. 2021) (naming statute "Government Liability Act").

Mr. Cardenas-Ornelas was required to comply with the GLA's procedural requirements—specifically, naming the State of Nevada as a defendant. Nev. Rev. Stat. § 41.031(2). Because Eleventh Amendment sovereign immunity would then apply, these claims would need to be dismissed—a convenient Catch-22.

The error in Warden Johnson's argument is that he assumes the procedural requirements of the GLA apply to *Mack* claims. They do not. Nevada constitutional provisions that are self-executing—that is, provisions that trigger *Mack* claims—"cannot be abridged or impaired by statute." *Alper v. Clark Cnty.*, 571 P.2d 810, 812 (Nev. 1977) .

This conclusion is apparent from the fact of *Mack* itself. The plaintiff, bringing a claim against NDOC officers alleging that she was unlawfully strip searched, did not sue the State of Nevada, and the case was not dismissed. *Mack*, 522 P.3d at 434. Because Mr. Cardenas-Ornelas did not name the State of Nevada as a defendant, and because the GLA cannot require him to do so, Eleventh Amendment sovereign immunity does not apply.

### C.     Because Identical Nevada Claims Will Proceed, This Court Lacks Jurisdiction to Hear an Interlocutory Appeal of the Denial of Qualified Immunity Regarding the Federal Constitutional Claims.

"On appeal, the appellant has the burden of establishing that the appellate court has jurisdiction to hear the case." *In re Ozenne*, 841 F.3d 810, 814 (9th Cir. 2016). Warden Johnson has not met his burden.

"Ordinarily, orders denying summary judgment do not qualify as 'final decisions' subject to appeal." *Ortiz v. Jordan*, 562 U.S. 180, 188 (2011) (quoting 28 U.S.C. § 1291). The Supreme Court carved out a narrow exception to this rule for *some* denials of qualified immunity. *Mitchell*, 472 U.S. at 526-27; *Ashcroft v. Iqbal*, 556 U.S. 662, 671-72 (2009). The purpose of this exception is to prevent denials of immunity from being "effectively unreviewable"; qualified immunity is designed to shield government officials from "the general costs of subjecting officials to the risks of trial" and post-trial review cannot remedy such costs. *Mitchell*, 472 U.S. at 526-27 (citation omitted).

*Mitchell* does not create a blanket right for defendants to appeal all denials of qualified immunity. The Supreme Court has circumscribed its application. A defendant does not have a right to appeal if the case is litigated in a state court that does not consider the denial of qualified immunity to be a final judgment. *Johnson v. Fankell*, 520 U.S. 911, 922-23 (1997). And government officials generally do not have the right to appeal a denial based on their disagreement with a district court's factual conclusions. *Johnson v. Jones*, 515 U.S. at 319-320.

Mr. Cardenas-Ornelas's case presents another instance where there is no interlocutory jurisdiction. Because the federal and Nevada constitutional claims are coextensive, and a qualified immunity defense is categorically unavailable as to the

latter, an interlocutory appeal will not save Warden Johnson from facing trial—indeed, from facing *the same* trial. No costs would be avoided.

As the Supreme Court and this Court have sensibly explained, when a lawsuit raises some claims for which qualified immunity is categorically unavailable and others for which it might be available, interlocutory jurisdiction exists only when the latter claims turn on (at least some) different questions of law or fact. *See Behrens v. Pelletier*, 516 U.S. 299, 311-12 (1996); *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004).

In *Behrens,* the Supreme Court clarified that the inclusion of claims for injunctive relief—to which qualified immunity does not apply—does not defeat interlocutory jurisdiction. 516 U.S. at 311-12. As spelled out by the lower courts, the basis for this ruling is that while injunctive-relief suits may list government officials in the caption, they involve claims against governmental bodies. *Espinal-Dominguez v. Puerto Rico*, 352 F.3d 490, 499 (1st Cir. 2003); *DiMartini v. Ferrin*, 889 F.2d 922, 925 (9th Cir. 1989). Government officials need not show up to trial and face no personal liability. *Espinal-Dominguez*, 352 F.3d at 499 (citation omitted). Thus, whether the government official is faced with the burdens of trial is entirely dependent on the trial court's grant or denial of qualified immunity on the damages claims. *Id.* at 498-99.

In *Beier*, this Court explained that *Behrens* permits interlocutory review in *some* cases raising additional damages claims for which qualified immunity is not at issue. 354 F.3d at 1064. In that case, the denial of qualified immunity was appealed as to some claims but not others. This Court recognized that even when a defendant must face trial on some damages claims, interlocutory jurisdiction exists over the denial of qualified immunity as to others if they turn on different legal or factual issues. *Id*. However, it emphasized the bounds of its decision. Its jurisdiction in *Beier* was based on the incongruity of the claims, which required "quite different inquiries" and were factually "distinct." *Id.* Because the claims lacked a shared "identity," they were "separable" under *Behrens*. *Id.*; *accord McLaurin v. Morton*, 48 F.3d 944, 949 (6th Cir. 1995) (interlocutory jurisdiction existed to review denial of qualified immunity on due process claim, even though Eighth Amendment claim would remain, as reversal would result in "more limited" trial); *Argonaut Great Cent. Ins. Co. v. Audrain Cnty. Joint Commc'ns*, 781 F.3d 925, 930 n.6 (8th Cir. 2015) (interlocutory jurisdiction existed over denial of immunity because remaining claim was "separate").[18]

---

[18] While this Court is not alone in extending *Behrens* to cases with only damages claims, the First and Seventh Circuits have not gone so far. *See Espinal-Dominguez*, 352 F.3d at 498-99; *Campbell v. Kallas*, 936 F.3d 536, 543-44 (7th Cir. 2019).

Unlike in *Mitchell*, *Behrens,* and *Beier*, Warden Johnson's trial will not look any different if he succeeds in reversing the district court's denial of qualified immunity on the federal claims. The Nevada constitutional claims will proceed to trial on the *same* legal issues and facts.[19] Not only is there no "justification for immediate appeal . . . sufficiently strong to overcome the usual benefits of deferring appeal until litigation concludes," there is no justification at all. *Garraway v. Ciufo*, 113 F.4th 1210, 1216 (9th Cir. 2024) (citation omitted).

To permit piecemeal litigation would be ill-advised. It would "undermine[] efficient judicial administration and encroach[] upon the prerogatives of district court judges, who play a special role in managing ongoing litigation." *Bullard v. Blue Hills Bank*, 575 U.S. 496, 501 (2015) (cleaned up). It would also "obstruct[] . . . just claims" and "permit[] the harassment and cost of a succession of separate appeals." *Cobbledick v. United States*, 309 U.S. 323, 325 (1940).[20]

---

[19] This is a novel issue; *Mack* was recently decided and Montana is the only other in-circuit state the constitution of which does not provide a qualified immunity defense. 522 P.3d at 451; *Dorwart v. Caraway*, 58 P.3d 128, 140 (Mont. 2002).

[20] *See also* Brief of Former Article III Judges and Law Professors as Amici Curiae in Support of Respondent, Mohawk Industries, Inc. v. Carpenter, 558 U.S. 100 (2009) (No. 08-678), 2009 WL 2040423 (arguing that unnecessary interlocutory appeals further encumber overburdened appellate courts); Joanna C. Schwartz, *Qualified Immunity's Selection Effects*, 114 Nw. U. L. Rev. 1101, 1119-25, 1146-47 (2020) (discussing how interlocutory appeals from denials of qualified immunity and their ensuing costs and effects on witnesses make plaintiff's attorneys more hesitant to accept cases); Joanna C. Schwartz, *How Qualified Immunity Fails*, 127

Regardless of whether it exercises jurisdiction over Warden Johnson's assertion of qualified immunity as to the federal constitutional claims, this Court lacks jurisdiction to determine the viability of Mr. Cardenas-Ornelas's claim under Nevada's constitutional provisions. Warden Johnson identifies no basis for interlocutory jurisdiction over this question, and there is none. His sole argument on appeal is that the state-law claims are barred by the Eleventh Amendment, OB at 47-50, but this Court has clearly held that interlocutory review is unavailable for denials of sovereign immunity. *Taylor v. Cnty. of Pima*, 913 F.3d 930, 934 (9th Cir. 2019). And there can be no pendent jurisdiction either; even if the federal qualified immunity issue were properly before this Court, it and the availability of a state constitutional cause of action are not "inextricably intertwined." *K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 975 (9th Cir. 2015). Since there is no qualified immunity defense to a *Mack* claim, resolution of the former will not resolve the latter. *Mack*, 522 P.3d at 451.

This Court should therefore dismiss this appeal in its entirety for lack of jurisdiction.

──────────────────────

Yale L.J. 2, 44-45 (2017) (showing that only 12.2% of interlocutory appeals from denials of qualified immunity resulted in reversals); Bryan Lammon, *Reforming Qualified-Immunity Appeals*, 87 Mo. L. Rev. 1137 (2022) (arguing for wholesale reform to current scheme of interlocutory appeals of qualified immunity).

## II.   THE DISTRICT COURT CORRECTLY DENIED WARDEN JOHNSON QUALIFIED IMMUNITY ON THE EIGHTH AMENDMENT CLAIM.

### A.   The District Court Correctly Held That There Is a Clearly Established Right to Exercise in Prison.

#### 1.   Controlling Case Law Has Clearly Established a Right to Regular Outdoor Exercise or in Some Circumstances Other Meaningful Recreational Opportunities.

It has long been clearly established that depriving incarcerated people of exercise violates the Eighth Amendment. *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991). Since 1979, this Court has recognized that "exercise is 'one of the basic human necessities protected by the Eighth Amendment.'" *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (quoting *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993); *see also Spain*, 600 F.2d at 199.

This Court's sister circuits agree. *Giacalone v. Dubois,* 121 F.3d 695, 1997 WL 413683, at *1 (1st Cir. 1997) (unpublished); *McCray v. Lee,* 963 F.3d 110, 120 (2d Cir. 2020) ("[T]he rights of prisoners to a meaningful opportunity for physical exercise had been clearly established [for] nearly three decades."); *Peterkin v. Jeffes,* 855 F.2d 1021, 1031 (3d Cir. 1988) ("meaningful recreation 'is extremely important to the psychological and physical well-being of prisoners'" (citation omitted)); *Mitchell v. Rice,* 954 F.2d 187, 191-92 (4th Cir. 1992) (prison's obligation to provide

prisoners with some opportunity to exercise was clearly established); *Patterson v. Mintzes,* 717 F.2d 284, 289 (6th Cir. 1983); *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996) (denial of exercise for up to seven weeks was sufficient to state claim); *Perkins v. Kan. Dep't of Corrs.*, 165 F.3d 803, 810 (10th Cir. 1999) ("there can be no doubt that total denial of exercise for an extended period of time would constitute cruel and unusual punishment prohibited by the Eighth Amendment" (citation omitted)).

For years, "this circuit has determined the long-term deprivation of *outside* exercise is unconstitutional." *LeMaire*, 12 F.3d at 1457 (emphasis in original); *see also Thomas v. Ponder*, 611 F.3d 1144, 1151-52 (9th Cir. 2010) ("For over thirty years, we have emphasized that some form of regular outdoor exercise is extremely important to the psychological and physical well-being of the inmates." (citation omitted)). Over three decades ago, this Court stated in *Allen* that "defendants cannot legitimately claim that their duty to provide regular outdoor exercise . . . was not clearly established." 48 F.3d at 1084.

Recently, a decision of this Court complicated that steady line of holdings, reading this body of precedent to say that the Constitution requires officials to "provide outdoor recreation opportunities, or otherwise meaningful recreation, to prison inmates." *Norbert v. City & Cnty. of San Francisco,* 10 F.4th 918, 929 (9th Cir. 2021) (quoting *Shorter v. Baca*, 895 F.3d 1176, 1185 (9th Cir. 2018)). *Norbert*

41

involved a claim that was alternately construed as asserting a right to exercise and a right specifically to direct sunlight. 10 F.4th at 928. Although *Norbert* recognized that in some circumstances, robust indoor recreational opportunities might be adequate, it left undisturbed the basic premise that otherwise, denial of outdoor exercise violates the Eighth Amendment. *Id.* at 929.

While *Norbert* upheld a district court's conclusion that it was sufficient to afford jail detainees at least half an hour of exercise time in the gym seven days a week as well as between half an hour and eight hours each day in common rooms, *id.* at 923, this Court has confronted and rejected arguments from correctional officials that limited or makeshift indoor exercise opportunities were adequate replacements for yard time. In *Spain*, it struck down a policy barring prisoners from outdoor exercise even though they were allowed to exercise, one at a time, for five hours per week in an indoor corridor. 600 F.2d at 199-200. Similarly, in *Pierce*, it rejected as unconstitutional a jail's policy of providing "only ninety minutes weekly in a space equipped for exercise." *Pierce v. County of Orange*, 526 F.3d 1190, 1212 (9th Cir. 2008). The jail argued that detainees also had access to an indoor dayroom, but the Court concluded that this "does not—given the space constraints and absence of any appropriate equipment—constitute an exercise opportunity." *Id.* at 1212 n.22.

### 2. Although Emergencies May Justify Short-Term Limits on Exercise Opportunities, It Is Clearly Established That Exercise May Not Be Eliminated for Staffing or Budgetary Reasons.

Before *Norbert*, this Court had permitted prison and jail officials to curtail access to outdoor exercise and substitute indoor alternatives only due to "unusual and highly volatile security-related concerns"—that is, only based on particularized concerns about grave violence—and, even then, only temporarily. *Shorter*, 895 F.3d at 1185-86 (identifying possible justifications as including "a series of particularly violent attacks against correctional officers").

In this prior line of cases, upon which Warden Johnson relies, the circumstances were truly exigent. (This Court has previously referred to them as "our 'genuine emergency' cases." *Thomas*, 611 F.3d at 1154-55.) In *Norwood v. Vance,* the prison barred all prisoners from outdoor exercise because there was an extensive and documented history of violence, often during yard time, including the murder of a prisoner and multiple attempted murders of officers. 591 F.3d 1062, 1065-66 (9th Cir. 2009). Similarly, in *Hayward v. Procunier*, denial of outdoor exercise was justified when in the leadup to it there had been 82 armed assaults, 12 killings, and 2 attempted escapes; on the day the policy was instituted, "two men were killed in separate incidents of gang violence." 629 F.2d 599, 600 (9th Cir. 1980). In *LeMaire,* prison officials banned one prisoner from outdoor exercise because he had stabbed a fellow prisoner, assaulted officers, rammed his head into

an officer's chest, and put staff under "constant threat of unpredictable assaults and bombardment with feces, urine, spit, food, and any available movable object." 12 F.3d at 1447-48.

By contrast, it has long been clearly established that prison officials may not deprive those in their custody of exercise due to mundane concerns like staffing or budgetary issues. *See Spain*, 600 F.2d at 200 (prison officials may not use "cost or inconvenience of providing adequate facilities [as a] defense to the imposition of a cruel punishment"); *see also Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980) ("We cannot permit unconstitutional conditions to exist simply because prison officials cannot or will not spend the money necessary to fulfill constitutional requirements.")

### B. The District Court Correctly Held That Mr. Cardenas-Ornelas Offered Evidence Sufficient to Prove That Warden Johnson Violated This Clearly Established Right.

#### 1. Warden Johnson, Well Aware of the Lengthy Deprivation of Opportunities to Exercise, Was Deliberately Indifferent.

To challenge unconstitutional conditions of confinement under the Eighth Amendment, a prisoner must meet both an objective and subjective requirement. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). First, the plaintiff must make an objective showing that he suffered a "sufficiently serious" deprivation of a basic

human need. *Id.* Second, he must show that the prison official acted "with a sufficiently culpable state of mind." *Id.*

Extended denials of exercise automatically meet the objective prong, even if the prisoner has alleged no adverse medical impacts. *Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000) (en banc). This Court has repeatedly held, *contra* OB at 33, that denials of exercise dramatically shorter than that experienced by Mr. Cardenas-Ornelas were lengthy enough to constitute per se violations. *Allen*, 40 F.3d at 1003-04 (six weeks); *Lopez*, 203 F.3d at 1132-33 (six and a half weeks); *Keenan v. Hall*, 83 F.3d 1083, 1088, 1090 (9th Cir. 1996) (six months); *Toussaint v. Yockey*, 722 F.2d 1490, 1492-93 (9th Cir. 1984) (one year). Moreover, *contra* OB at 33, Mr. Cardenas-Ornelas has indeed identified several serious physical and emotional consequences of his long-term lockdown. (4-ER-472, 631.)

The subjective prong asks "whether the risk to the inmate was sufficiently 'obvious' to the prison officials that they must have been aware of the severity of the deprivation." *Thomas*, 611 F.3d at 1151. As this Court explained in *Thomas*, longstanding circuit caselaw has so "uniformly stresse[d] the vital importance of exercise for prisoners" that the risks of an extended deprivation are obvious to prison officials "as a matter of law." *Id.* at 1151-52. "The mere fact of the total deprivation of [the] right to out-of-cell exercise for almost fourteen months [was therefore] sufficient" to show obviousness. *Id.* at 1152.

If officials were aware of the obvious risk posed by the deprivation, they can still avoid liability if their response was "nonetheless reasonable." *Id.* at 1152. This analysis considers whether officials could have made alternate arrangements to provide out-of-cell exercise; failure to do so is unreasonable. *Id.* at 1155; *see also Spain*, 600 F.2d at 200 (even when security concerns justify deviations from normal practice, they "do not explain why other exercise arrangements were not made"). Such reasoning applies even in cases where officials are acting in the interests of the prisoner in preventing him from participating in ordinary yard time; in *Lopez*, this Court explained that even if a record supports prison officials' assertion that they have "denied [a prisoner] yard access for his own protection, it does not explain why [he] was not given some other opportunity for outdoor exercise." 203 F.3d at 1133.

Mr. Cardenas-Ornelas has therefore satisfied the subjective prong as well. As established in *Thomas*, the risk posed by barring Mr. Cardenas-Ornelas from all out-of-cell exercise for months on end was obvious as a matter of law. There is ample evidence in the record that Warden Johnson knew that he and his unit-mates were being deprived of exercise. Between June 12, 2020, and September 4, 2020, Mr. Cardenas-Ornelas filed five grievances addressing the severity of the deprivation, including one where he explained how he had been confined to his cell for 23 to 23 ½ hours a day "for the past 86 days." (3-ER-268, 276-78, 301-02, 312, 314, 316.) Despite receiving Mr. Cardenas-Ornelas's grievances, and personally responding to

one, Defendant Johnson took no action to provide an alternative recreational opportunity. His (lack of) response was thus unreasonable.

### 2. Mr. Cardenas-Ornelas Was Afforded No Meaningful Alternative to Outdoor Exercise.

Warden Johnson argues that Mr. Cardenas-Ornelas was provided with alternatives to outdoor exercise, because he "was able to exercise in his cell." OB at 33. And he asserts that the brief walk down the hall to the warehouse and the time spent sorting hangers and cards qualified, too. *Id.* This Court's caselaw and common sense are to the contrary.

As discussed above, *Norbert* and *Pierce* stand for the proposition that "otherwise meaningful recreation" will necessarily include some regular time in an area equipped for exercise purposes. *Norbert*, 10 F.4th at 922-23, 933-34; *Pierce*, 526 F.3d at 1212 n.22. The warehouse where Mr. Cardenas-Ornelas was sent to work was not set up for exercise; it was set up for sorting clothes hangers and cards. And a short walk down a hallway is not "meaningful recreation," as made crystal clear by *Spain*. 600 F.2d at 199-200 (rejecting argument that five hours per week spent in corridor was sufficient); *see also Cauthron*, 623 F.2d at 507 ("Merely allowing the inmates to walk around in the narrow corridor between cells does not provide adequate exercise."). Warden Johnson's attempt to argue otherwise is disingenuous.

He has pointed to no case wherein prison labor constituted "otherwise meaningful recreation," and undersigned counsel is aware of none. The opening brief repeatedly relies instead, OB at 9, 33, 36, on an obvious misreading of language from *Spain* (and quoted in *Norbert*) about "affirmative programs of training and rehabilitation." *Spain*, 600 F.2d at 199; *Norbert*, 10 F.4th at 934. Warden Johnson says that these cases hold that such programs count as adequate alternatives to exercise. Not hardly. Instead, they merely recognize the absence of programming as one among several "degrading conditions" the *Spain* plaintiffs had suffered, alongside deprivation of recreational opportunities. *Id*.

If exclusively in-cell exercise satisfied the Constitution, this Court's entire line of exercise doctrine would be a dead letter.[21] Someone in prison or jail, unless strapped down in four-point restraints, can always find a bit of cement floor on which to do a push-up. This Court's numerous prison and jail exercise cases do not stand for the proposition that an incarcerated person may be left in his cell, 24 hours per day, just so long as his physical movement inside that small space is not entirely

---

[21] In a troubling misrepresentation, the opening brief states that "Cardenas-Ornelas concedes that he was able to exercise in his cell," a proposition for which it cites the declarations of four prison officials, each of whom attests without basis or elaboration to his or her opinion that "Cardenas-Ornelas would still have been able to exercise in his cell." OB at 33 (citing 3-ER-196, 424, 430, 449-50). Mr. Cardenas-Ornelas does not so concede.

constrained. Instead, they protect a right to "meaningful" recreation. *See Toussaint*, 722 F.2d at 1492-23 (holding unconstitutional prison policy that barred all outdoor exercise and kept prisoners in cells for 23 ½ hours per day).

> ### 3. Even in Theory, the Pandemic Could Not Justify the Lengthy Deprivation of All Access to Exercise. In Fact, Unit 9's Yard Time Was Cancelled for Unlawful Staffing and Budgetary Reasons.

Warden Johnson seeks to rely on *Norwood* and *LeMaire*'s security exceptions to excuse his decision to deprive Mr. Cardenas-Ornelas of outdoor exercise for over a year.[22] OB at 30, 34. But they are inapt. There was no security risk here, and no meaningful alternative to outdoor exercise provided. Even assuming for the sake of argument that this doctrine could apply to public health emergencies and that it might permit denial of all forms of exercise for some brief period of time, there is simply

---

[22] Warden Johnson also attempts to rely on *Norwood* for the proposition that prison officials had discretion to determine when exercise opportunities could safely be restored following the month-long emergency lockdown that began in March 2020. OB at 36 (citing *Norwood*, 591 F.3d at 1069). But as yet another Nevada district court concluded in litigation challenging similar and contemporaneous conduct by officials at HDSP, when "it appears that the emergency has become the normal," it cannot excuse deprivations of outdoor exercise. *Henrickson v. Nevada*, No. 2:20-cv-01014, 2021 WL 1603965, at *2 (D. Nev. Mar. 23, 2021). Warden Johnson implicitly acknowledged the end of the acute emergency when he reopened the warehouse and lifted lockdowns for other units in April 2020. (2-ER-72; 3-ER-269, 440.)

no evidence in the record that yard time posed an increased risk to prisoners or staff. To the contrary, CDC guidance for correctional institutions recommended it.[23]

Moreover, Warden Johnson does not claim that it would have posed an unacceptable risk of transmission *within* Unit 9 to send its residents to the yard. Such a suggestion would be contradicted by his own behavior; Warden Johnson had already deemed it safe for them to go to work together in the warehouse. Instead, his argument turns on the conclusory assertion that units could be separated in the warehouse but—somehow—not in the yard, and that the resulting commingling would have risked additional contagion. OB at 16. Of course, with adequate planning, he could have afforded Unit 9 outdoor at least some exercise time alone.[24] Refusal to do so was a choice—one that "plac[ed] inconsequential logistical concerns that [were] no more than matters of convenience above [Mr. Cardenas-Ornelas's] need for exercise." *Allen*, 48 F.3d at 1084; *Shorter*, 895 F.3d at 1186

_____

[23] Ctrs. for Disease Control & Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities at 11 (Mar. 27, 2020), https://www.bop.gov/foia/docs/CDCCorrectionalfacilityguidance3.23.pdf; *Daniels-Hall*, 629 F.3d at 998-99.

[24] Yard time was separated by unit both before and after this period of time. (4-ER-495-501.) *See also* Plaintiff's #2 Supplemental to Plaintiff's Motion for Summary Judgment at 43-50, McGuire v. Nevada Dep't of Corr., No. 3:23-cv-00165 (D. Nev. Aug. 7, 2024).

(challenges of coordination and scheduling are no "excuse" for "wholesale, routine deprivation of . . . meaningful recreation activities").

All this is beside the point, though. This Court has jurisdiction—if at all—only to consider whether, taking Mr. Cardenas-Ornelas's version of the facts as true, Warden Johnson violated clearly established law. *See Johnson*, 515 U.S. at 319-20; *Watkins*, 145 F.3d at 1091. A jury could find—indeed, Warden Johnson and other HDSP officials have admitted—that he deprived Unit 9 of outdoor exercise not because he believed doing so was necessary to prevent infection, but because the prison was short-staffed and he preferred to allocate available officers to revenue-generating activities. OB at 37. (2-ER-56, 73, 77, 108, 110, 113; 3-ER-423.)

As the district court correctly concluded, Warden Johnson's "arguments regarding the cost of providing yard time fail to provide adequate justification because the Ninth Circuit has explained that '[t]he cost or inconvenience of providing adequate [exercise] facilities is not a defense to the imposition of a cruel punishment.'" (1-ER-16 (citing *Spain*, 600 F.2d at 200).) Another Nevada district court recently reached the same conclusion in another case about the very same unit at HDSP, where similar violations have apparently recurred. In *Ross*, a fellow Unit 9 prisoner was denied access to exercise for over six months in 2022. 2023 WL 2373798, at *1. The Warden's response: logistical obstacles made it difficult to staff the yard. *Id.* at *4 (citing testimony of associate warden that "most of the lockdowns

51

at HDSP resulted from staffing shortages"). That court reasoned that such administrative concerns "cannot justify serious civil rights violations such as the deprivation of a basic human need." *Id.* (quoting *Shorter*, 895 F.3d at 1186). It entered an injunction requiring that HDSP provide the plaintiff with at least seven hours of outdoor exercise per week. *Id.* at *6.

### 4. Warden Johnson Was Personally Responsible for Depriving Mr. Cardenas-Ornelas of Exercise.

Warden Johnson also seeks to avoid liability by claiming that he was an administrator simply following the directives of a medical provider, like the one in *Peralta v. Dillard*. OB at 43, 46 (citing 744 F.3d 1076, 1086-87 (9th Cir. 2014)). This attempt at comparison fails for three reasons.

First: Warden Johnson's argument impermissibly hinges on his version of contested facts—that protecting people from COVID-19 was the justification for the deprivation. But again, on interlocutory review, this Court must take as true Mr. Cardenas-Ornelas's version of the facts: Warden Johnson did not deprive Mr. Cardenas-Ornelas of outdoor exercise to protect him and others from infection, but instead did so for reasons that have nothing to do with health and which this Court has expressly held cannot justify deprivations of constitutional conditions of confinement: staffing shortages and budgetary issues. *Myers*, 129 F.4th at 1193.

Second: Even if the Court were to assume—as it cannot—that Warden Johnson was motivated by a desire to mitigate the spread of COVID, he has identified no evidence other than his own bald assertion that the NDOC Medical Director actually suggested, let alone ordered, that prisoners should be denied outdoor exercise. OB at 38, 41-44 (citing to 3-ER-209-56). The records he has cited in purported support address an assortment of infection control measures but nowhere indicate that outdoor exercise should be limited or denied. (3-ER-209, 212-13, 218, 221, 231-32, 239, 241-50.)

Third: Warden Johnson is different than the *Peralta* administrator for another fundamental reason. That official was not liable because he was not required to second guess the medical judgment of a dentist providing care to an individual patient. *Peralta*, 744 F.3d at 1086-87. Here, the directives Warden Johnson says he was following (but of which he has been able to produce no evidence) were not decisions about a particular person's medical care; they were high-level population management policies applied to the incarcerated population writ large and well within the professional ken of a facility's warden. (3-ER-426-27 (decisions about who to send to yard were "handled at the local level" by facility administrators).)

53

III.  **THE DISTRICT COURT CORRECTLY DENIED WARDEN JOHNSON QUALIFIED IMMUNITY ON THE EQUAL PROTECTION CLAIM.**

A.  **Prisoners Have a Clearly Established Right Not to Be Subjected to Discrimination Unless Justified by Legitimate Penological Interests.**

"The Equal Protection Clause requires the State to treat all similarly situated people equally." *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008). Prisoners retain a right to equal protection as guaranteed by the Fourteenth Amendment. *Walker v. Gomez*, 370 F.3d 969, 974 (9th Cir. 2004). A prisoner's right not to be subjected to discrimination without penological purpose or to be arbitrarily denied a constitutional right is clearly established in this circuit. *See Freeman v. Arpaio*, 125 F. 3d 732, 739 (9th Cir. 1997), *overruled in part on other grounds by Shakur*, 514 F.3d at 884-85; *Shakur*, 514 F. 3d at 891; *accord Williams v. Lane*, 851 F.2d 867, 881-82 (7th Cir. 1988) (affirming permanent injunction, holding that disparate treatment of people in protective custody violated their equal protection rights because officials' "purported justification in terms of security concerns [was] an arbitrary and exaggerated response and mask[ed] defendants' real delinquencies").

To challenge discriminatory treatment under the Equal Protection Clause, an imprisoned plaintiff must make a two-part showing: (1) that he was treated differently from other similarly situated prisoners; and (2) that the actions of prison officials were not reasonably related to legitimate penological interests. *See Shakur*,

514 F.3d at 891-92. "[M]ere rational basis review" is "the wrong standard"; instead, courts must apply the *Turner* test to determine whether there is a penological justification for the distinction in treatment. *Id*. at 891 (citing *Turner v. Safley*, 482 U.S. 78, 89-90 (1987)). The relevant inquiry is not only whether legitimate penological interests justify limitations on a plaintiff's constitutional rights, "but also whether those limitations are reasonable when measured against the limitations placed on other inmates." *Sutton v. Stewart*, 22 F. Supp. 1097, 1107 (D. Ariz. 1998), *aff'd*, 185 F.3d 869 (9th Cir. 1999).

The Supreme Court has held that "*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective." *Beard v. Banks*, 548 U.S. 521, 535 (2006). Under *Turner,* there are four factors relevant to the reasonableness analysis: (1) whether the regulation is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative avenues that remain open to the prisoner to exercise the right; (3) the impact that accommodating the asserted right will have on other staff and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials. *Turner*, 482 U.S. at 89-91.

The analysis begins at *Turner*'s first step. If prison officials can show a "common-sense connection" between a legitimate objective and the prison policy,

the plaintiff can present evidence to refute it. *Prison Legal News v. Lehman*, 272 F. Supp. 2d 1151, 1156 (W.D. Wash. 2003), *aff'd*, 397 F.3d 692 (9th Cir. 2005); *Ashker v. Cal. Dep't of Corr.*, 350 F.3d 917, 922-23 (9th Cir. 2003). Then, prison officials bear the burden of "present[ing] enough counter-evidence to show that the connection is not so remote as to render the policy arbitrary or irrational." *Frost v. Symington*, 197 F.3d 348, 357 (9th Cir. 1999) (citation omitted).

If a defendant fails to show that a prison regulation is rationally related to a legitimate penological objective, courts do not consider the other factors. *Ashker*, 350 F.3d at 922; *see also Lehman*, 272 F. Supp. 2d at 1159 (finding for plaintiff on step one of *Turner* and granting summary judgment). If, however, prison officials satisfy the first step, courts must still weigh the remaining factors.

Although the *Turner* standard does give prison officials significant leeway, this Court and others regularly find that there is no rational connection between prison policies and officials' proffered penological interests. Prison officials cannot demonstrate the required rational relationship through conclusory statements about policy purpose, and "vague and overbroad explanations [are] insufficient to establish the necessary connection under *Turner.*" *Dunne v. Smith*, No. 1:07-cv-00074, 2009 WL 840651, at *5 (E.D. Cal. Mar. 27, 2009). Defendants must not only show that the policy overall is rationally related to a legitimate penological purpose but also explain how *the distinctions it draws* advance that purpose.

56

In *Shakur*, this Court concluded that a prison's differential treatment of Muslim prisoners was not reasonably related to legitimate penological interests under *Turner*. 514 F.3d at 891. The plaintiff challenged the prison's refusal to provide Muslim prisoners the same Kosher meals it provided to Jewish prisoners; defendants asserted that this differential treatment was justified by a penological interest in avoiding the "extensive cost" of doing so. *Id.* In denying prison officials summary judgment, *Shakur* explained that "it is not at all clear that the prison's purported cost justification is even valid given the large expense it already undertakes to provide its Jewish inmates with costly Kosher meals." *Id.* Prison officials had failed to tie the distinction they drew between different categories of prisoners to a legitimate penological interest.

Likewise, in *Morrison v. Hall*, this Court considered a challenge to a policy of banning bulk-rate and third- and fourth-class mail. 261 F.3d 896 (9th Cir. 2001). It concluded that although preventing contraband from entering the prison was plainly a legitimate purpose, and although such a policy would make interdiction easier through "volume control," the policy failed at *Turner*'s first step because the defendants had not offered any evidence to show that drawing a distinction based on postage rate was rational; they were not free to select an "arbitrary means" of achieving a legitimate end when doing so infringed on prisoners' constitutional rights. *Id.* at 903-04. A similar policy was rejected in *Lehman*, which concluded that

although banning receipt of certain types of mail might well reduce contraband, mitigate fire hazards, and improve the efficiency of cell searches, defendants had failed to show that these types of mail posed greater risks than others in these respects (or to show why alternative regulations were insufficient to address their concerns). 272 F. Supp. 2d at 1157.

### B.    A Jury Could Find That Warden Johnson Lacked Any Penological Justification for Depriving Unit 9 of Outdoor Exercise While Affording It to Others.

Warden Johnson's decision to deprive Unit 9 of exercise for over a year while allowing other prisoners yard time and sending Unit 9 to work in the warehouse fails at *Turner*'s first step. This is clear from the district court's conclusions that a rational trier of fact could find that Warden Johnson's reasons for denying Unit 9 exercise were "pretextual and lacked any rational basis," given that they were required to return to work; that Warden Johnson treated its resident "differently than other similarly situated groups," because they were not allowed yard time even when not under exposure-related quarantine;[25] and that this discrimination was intentional and

---

[25] Again, Warden Johnson identifies a single day in June 2020 on which, he says, Unit 9 was not permitted to "resume yard time . . . based on inmates in that unit having tested positive" at some unspecified previous point. (3-ER-424.) As the district court correctly concluded, this is grossly insufficient to carry his burden to "show that the connection is not so 'remote as to render the policy arbitrary or irrational.'" *Frost*, 197 F.3d at 357 (citation omitted).

based on his dislike of those in protective custody. (1-ER-27-28.) These are factual findings that this Court is required to accept on interlocutory review. *Watkins*, 145 F.3d at 1091; *Myers*, 129 F.4th at 1193.

Warden Johnson attempts to rely on two non-prison-related equal protection cases, but both are unavailing. First, he points to *Seaplane Adventures, LLC v. Cnty. of Marin*, 71 F.4th 724, 728029 (9th Cir. 2023), wherein a private seaplane operator sued Marin County over the its policy of grounding non-essential flights. OB at 39-42. Warden Johnson relies on the court's reasoning that "health officials traditionally have broad discretion . . . to take actions to stem the transmission of a contagious disease." OB at 40 (quoting *Seaplane,* 71 F.4th at 730). True enough. But Warden Johnson is not a health official, and, as the district court recognized, a jury could conclude that his decision to preclude Unit 9 from exercising while allowing others to do so was not made in an effort to prevent infection.

Second, he relies on *SmileDirectClub, LLC v. Tippins*, which found that an Invisalign vendor was not similarly situated to other dentists and orthodontists for purposes of an equal protection claim, to argue that Mr. Cardenas-Ornelas was not similarly situated to other prisoners who received access to outdoor exercise. OB at 40 (citing 31 F.4th 1110, 1123 (9th Cir. 2022)). But Warden Johnson has not offered evidence to show that Unit 9 was continuously under exposure-related quarantine

while other units were not; indeed, the record and other available evidence strongly suggest otherwise.

Warden Johnson's failure to satisfy *Turner*'s first step resolves this issue in Mr. Cardenas-Ornelas's favor. However, the remaining *Turner* factors also point in the same direction. As discussed, Warden Johnson failed to make any meaningful alternative to outdoor exercise available to Unit 9, keeping them locked down without any recreational opportunities for months. Accommodating the right would not have imposed any unreasonable burden on staff or other prisoners; at most, it would have required that Unit 9 be allowed to visit the yard on its own.[26] Finally, the existence of such an easy and obvious alternative—and the willingness of Warden Johnson to send Unit 9 to work in an indoor warehouse—reflect that his decision to bar them from exercise was at best an exaggerated response to the pandemic; at worst, his infection-control rationale was a sham.

---

[26] Even this would probably have been unnecessary for much of 2020, since it appears that none of Unit 9's residents were infected for long stretches of this time. *See supra* note 2. Moreover, yard time was separated by unit both before and after this period of time. (4-ER-495-501.) *See also* Plaintiff's #2 Supplemental to Plaintiff's Motion for Summary Judgment at 43-50, McGuire v. Nevada Dep't of Corr., No. 3:23-cv-00165 (D. Nev. Aug. 7, 2024).

## CONCLUSION

For the foregoing reasons, this Court should dismiss this appeal for lack of jurisdiction. If the Court were to conclude that it has jurisdiction, it should affirm the district court's denial of Warden Johnson's motion for summary judgment.

Dated:        May 30, 2025                    Respectfully submitted,


                                              */s/ Aaron Littman*

Samuel Weiss                                  Aaron Littman
RIGHTS BEHIND BARS                            UCLA SCHOOL OF LAW
1800 M Street NW Front 1 #33821               PRISONERS' RIGHTS CLINIC
Washington, D.C. 20033                        385 Charles E. Young Drive E
(202) 455-4399                                Los Angeles, CA 90095
                                              (310) 825-9562

*Attorneys for Appellee Luis Cardenas-Ornelas*

## STATEMENT OF RELATED CASES

The undersigned is aware of three related cases currently pending in this Court.

1.    *McGuire v. Johnson*, No. 25-1457 (9th Cir. Mar. 07, 2025) (appealing 3:23-cv-00165 (D. Nev. Feb. 21, 2025)). *McGuire* similarly involves a person confined in HDSP alleging that Warden Johnson deprived him of outdoor exercise during the same time period. It shares this case's procedural posture—the defendant has appealed the denial of qualified immunity at summary judgment. Unlike in the present case, however, the plaintiff has raised no state-law claims or federal equal protection claims.

2.    *Paulo v. Williams*, No. 24-1083 (9th Cir. Feb. 29, 2024) (cross-appealing 2:19-cv-00474 (D. Nev. Dec. 14, 2023)). *Paulo* similarly involves a person confined in protective custody at HDSP alleging a denial of outdoor exercise during the same time period. The remaining defendants are different. Unlike in the present case, the primary issue on appeal is whether the plaintiff exhausted the administrative grievance process.

3.    *Jones v. Gittere*, No. 25-3100 (9th Cir. May 14, 2025) (appealing 2:24-cv-00171 (D. Nev. May 6, 2025)). *Jones* similarly involves a person confined at HDSP (albeit not in protective custody) alleging a denial of outdoor exercise, albeit during a later time period. The defendants are different. Unlike in the present

case, the primary issue on appeal is whether the plaintiff exhausted the administrative grievance process.

*/s/ Aaron Littman*
Aaron Littman

*One of the Attorneys for Appellee*
*Luis Cardenas-Ornelas*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Circuit Rule 32-1(a) because it contains 14,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6).


*/s/ Aaron Littman*
Aaron Littman

*One of the Attorneys for Appellee*
*Luis Cardenas-Ornelas*

## CERTIFICATE OF SERVICE

I certify that on May 30, 2025, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will thereby receive service.

*/s/ Aaron Littman*
Aaron Littman

*One of the Attorneys for Appellee*
*Luis Cardenas-Ornelas*